[Crim. No. 18.   Third Appellate District.—May 15, 1906.]

## THE PEOPLE, Respondent, v. CHARLES SULLIVAN, Appellant.

CRIMINAL LAW—MURDER—STATEMENTS OF DECEASED IN PRESENCE OF DEFENDANT—SILENCE OF DEFENDANT.—Upon a trial for murder of a policeman, statements made by the deceased, in the presence and hearing of defendant and his associate after their arrest for the murder, that the associate had first attacked him, and that he grappled with him, whereupon defendant took something from his pocket, and shot him twice, were admissible, not as independent

proof, but as calling for a reply in connection with proof that they were not prevented from making a reply, and that neither of them made any response to such statements.

ID.—NOTICE FOR NEW TRIAL—NEWLY DISCOVERED EVIDENCE—AFFIDAVIT OF ASSOCIATE—DISCRETION.—An affidavit made by the associate, who had been convicted of manslaughter, that he would testify upon a new trial, if granted to the defendant, that he had fired the fatal shots in self-defense, when there can be no doubt, from the evidence, that each of the men knew every fact and circumstance known by the other, cannot be said to constitute newly discovered evidence. The motion for a new trial, on that ground, was addressed to the discretion of the court, and it cannot be said, in view of the record upon appeal, that it was an abuse of discretion to refuse to grant a new trial based upon such affidavit.

ID.—REMOVAL OF DISABILITY OF WITNESSES.—The fact that upon the first trial of the defendant, prior to the conviction of the associate for manslaughter and his acquittal for murder, the associate might have been protected from testifying for defendant that he fired the fatal shot on the ground that it would tend to convict himself, and that he could give such testimony with impunity upon a new trial of the defendant, does not conclusively entitle the defendant to a new trial.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco, and from an order denying a new trial. Wm. P. Lawlor, Judge.

The facts are stated in the opinion of the court.

Nathan C. Coghlan, and W. T. Hume, for Appellant.

U. S. Webb, Attorney General, and C. N. Post, Assistant Attorney General, for Respondent.

CHIPMAN, P. J.—Defendant was convicted of the crime of murder in the second degree and was sentenced to imprisonment during his natural life. He appeals from the order denying his motion for a new trial and from the judgment of conviction.

Joseph M. Sullivan testified: That about midnight of August 10, 1903, defendant and his codefendant Powell, were fighting one Delehanty near the corner of First and Folsom streets in the city of San Francisco, when Officer Sample came up and separated them and defendant and Powell went

away .along Folsom street in the direction of Second street. Sample followed them a short distance and came back to where he first encountered the parties and said to witness: ''What I should have done was to use my club.'' The witness told him the affair was over and the best thing to do was ''to drop it as it was.'' Sample said ''No,'' and started after them again. This was the last this witness saw of them. Witness Shanberger, a lodger at No. 545 Folsom street, south side, testified that he heard a noise on the street shortly after 12 o'clock; he got out of bed and looked out of the window and saw two men standing on the opposite sidewalk; that one of these men shot a pistol twice and both men ran together along the same side of Folsom street toward Second street and toward the election booth on the street; that one crossed to the south side of the street and the other man on the north side to the election booth, where he lost sight of them. After they had run away witness looked where he first saw them and he saw a man lying on the sidewalk on the north side of Folsom street. This man was Sample, the deceased, alleged victim of defendant and Powell.

There was evidence tending to show that the two men seen by this witness were defendant and Powell, one of whom must have fired the fatal shot; both were arrested within a very short time after the shooting and while near to, and in the act of running away from, the scene of the homicide, and were taken to the place where the wounded man was lying. Policeman Nobmann, one of the arresting officers, testified without objection, that when the prisoners were brought there he asked Sample who shot him, and he replied: ''A man by the name of Sullivan, and another man whose name I don't know. He said: 'The other man I don't know attacked me first.' We asked him, I says to him, Are these the two men? and he says, 'Yes, Sullivan, the smaller man, shot me, and the other man, whose name I don't know, attacked me first.' '' This conversation was within hearing of both defendants—standing within four or five feet of Sample—and Nobmann testified that ''neither man said anything in response to that.'' Officer Clark, who arrested Sullivan, gave similar testimony. When first arrested, Sullivan, as Clark testified, pointed to Powell as the man who fired the shots. There was sufficient evidence, as the record stands, to support the verdict and we

do not understand defendant to claim otherwise. His claim is, rather, that the record contains prejudicial error and particularly that the affidavit of Powell that he, and not defendant, fired the fatal shot, entitles defendant to a new trial, the refusal of which is claimed as error.

1. Immediately following his injuries, Sample was removed to the Harbor Receiving Hospital. He was then placed under examination by Dr. Millar, who testified: "I heard a statement by the wounded man in the presence and hearing of the two defendants, while the wounded man was on the operating table; the defendants were in such a position that they must have heard it." Upon being asked what was said by Sample respecting his injuries and by whom caused, in the presence of Sullivan, the defendant, objection was made on the ground that the proper foundation had not been laid and that the testimony of police officer Nobmann "shows clearly it is incompetent." The objection was overruled and exception taken by defendant. The witness answered: "He said that he went there, was attacked by the two defendants, that they knocked him down and took his revolver away from him and that Sullivan shot him twice. I don't remember any statement made by the defendant Sullivan, when that statement was made in his presence and hearing. The codefendant Powell, in whose presence and hearing the statement was made, did not, that I remember, say anything." On cross-examination he testified: "Sample talked in an audible voice, distinctly. There could be no misunderstanding of what he said." Witness Flood, assistant warrant and bond clerk in the district attorney's office, was present and endeavored to take down Sample's dying statement. This witness testified somewhat fully to the particulars of the encounter between Sample and both defendants as narrated by Sample. He testified that Sample "positively identified both of the defendants as being the men that were engaged in the struggle with him and the man that shot him. He said while the grappling and struggling was going on that Sullivan had shot him. Neither of the defendants made any answer to these statements made in their presence."

Witness Duke, Lieutenant of Police, was present and testified that he heard Sample say that Sullivan shot him and that "Sullivan said nothing in response to that declaration."

Officer Nobmann testified to having heard Sample make the statement referred to by the other witnesses and that neither defendant made any reply in response to the accusation of Sample. Defendant does not seriously contend that these witnesses misstated the facts; his contention is that he was under restraint and was not allowed to speak; that he and his codefendant had been roughly admonished by the police officers not to speak and that the evidence was highly prejudicial as tending to show guilt by remaining silent under circumstances when he was called upon to deny the accusation.

Officer Nobmann was called by defendant as his witness and testifying as to Sample's statement and defendant's silence further said: "I would not permit him or the other defendant to talk together in a whisper or anything I could not hear. These were my instructions from Lieutenant Duke, not to allow them to talk in a tone of voice I could not hear. I don't think Lieutenant Duke added to these instructions the words 'nor to anybody else.' I told defendants that I would not let them speak among themselves when I could not hear it."

"Q. Let me refresh your memory upon this point—Page 96 of the testimony in the police court in this case, commencing with the first question at the top of the page: 'Mr. Nobmann, is it not true that Sullivan said, "Hold on, Bob, hold on" (referring to Sample). And did you turn around and state: "You shut up, or I will break your face"? A. No, sir.

" 'Q. Was anything of that kind said? A. No, no.

" 'Q. Nothing at all? A. Nothing at all.

" 'Didn't Mr. Sullivan at any time undertake to stop Mr. Sample when he was talking about who shot him? A. No, sir.

" 'Q. Did Mr. Powell? A. No, sir.

" 'Q. Did Mr. Sullivan or Mr. Powell say anything to any other person there while he was making this statement? A. I couldn't say.

" 'Q. You had them in your charge? A. Yes, I had them in my charge certainly; but we wouldn't let them say anything, in fact, to anybody. Lieutenant Duke ordered me not to let them talk to themselves.' Did you testify that way in the police court in this city?

"A. I must have; yes, sir. It was undoubtedly true."

Cross-examination to Mr. Ferrall:

"As a matter of fact neither I nor anybody at all, did interfere with their speaking at any time while the statement was being made by the wounded man.

"Q. (By Mr. Eddy.) Did you in the court below testify as follows: 'I had them in charge, certainly; but we would not let them say anything, in fact, to anybody. Lieutenant Duke ordered me not to let them talk even to themselves.' Did you so testify in the courtroom? A. I must have.

"Q. Was it true? A. Yes, sir.

"Mr. Ferral: Q. Did you in point of fact interfere with them or either of them in speaking or saying or doing anything whatever when Robert Sample, the wounded man, was making his statement in their presence and hearing? A. No, sir.

"The Court: Let me have that testimony. Listen to this, officer: 'You had them in your charge? A. Yes, I had them in my charge, certainly; but we would not let them say anything, in fact, to anybody. Lieutenant Duke ordered me not to let them talk to themselves.' You have stated what is down here is true, in answer to the question of Mr. Eddy—in reply to the inquiry of the district attorney, you say that you did not prevent them from talking to anybody, except that you would not allow them to talk to themselves. Did you prevent them from talking to any other person? A. Nobody else wanted to talk to them.

"Q. What do you mean when you say this statement is true: 'Yes, I had them in charge, certainly; but we wouldn't let them say anything in fact to anybody. Lieutenant Duke ordered me not to let them talk "to themselves"'? A. I don't know. I don't remember that part of it.

"The Court: Q. Do you modify your statement, then, that you don't recall if they would not let them say anything to anybody?

"A. The fact is, they were together and Lieutenant Duke said: 'Don't let those men talk to each other, except in a tone of voice that you can hear.'

"Mr. Ferral: Q. Did anybody in any way interfere with them when the statement was made by the wounded man in their hearing?

"A. Not to my recollection.

"Q. Would you not recollect it if it occurred? A. I would not be sure as to that—as to whether anybody tried to talk to them or not.

"Q. Have you any memory of anybody interfering with them or trying to stop them from talking? A. Excepting myself talking between the two of them.

"Q. I say, in regard to talking in response to what the wounded man said, did you or anybody else interfere with them in any way, shape or manner from answering that? A. Not that I remember, no."

Lieutenant Duke was at the bedside of Sample when the statements above referred to were made. He testified:

"I asked Sullivan what he knew about this case and he declined to talk and shortly after I asked these men, the defendants stepped slightly to one side and commenced to talk in an undertone, and I said to Officer Nobmann, 'Don't let these men talk unless you know what they are talking about, and if they have anything to say, let them say it in the open. If they won't speak so that you can hear them, don't let them talk at all.' Officer Nobmann followed that instruction. I then spoke to Officer Sample and he told me how the thing occurred. It was substantially the same as the statement that he made. He told me in the presence and hearing of these two defendants. I know they were near enough to hear it and did hear it. I took the precaution to tell them if they could not hear every word that was said to let us know so that they might hear it. They were seated opposite the body and nearer to the deceased than I was, that is, within a foot or so nearer. I was at the edge of the bed and Officer Sample's head was at the head of the bed, and they were between Officer Sample and myself. Sample stated that he had received information that a fight was in progress near First and Folsom streets and he went there, but I don't remember whether he got there before the fight was over or not. But at any rate he felt that it was his duty to place the defendants Powell and Sullivan under arrest, and he was grappling with Powell when the defendant reached for his pocket and took something out of his pocket, and very shortly after that he was shot, and I asked him if it was possible for anybody

else to have done the shooting but Sullivan—he mentioned Sullivan's name and said: 'Do you know Sullivan personally?' and he said: 'Yes.' He said very little else in regard to the shooting. He simply stated that he had been shot and that he knew that Sullivan had done the shooting. He said that Sullivan took something out of his, Sample's, pocket. He did not say anything as to with what pistol he was shot. He did not say anything as to that to me. But his pistol, or rather the pistol, was there in the possession of Officer Nobmann, and I showed him that pistol and asked him if that was his pistol and he said that it was, and that it had been in his pocket shortly previous to the time of the fight or the trouble. I can identify the pistol shown me as the same pistol that was shown to Officer Sample, and which he identified as his pistol. I noticed its condition and there was one empty chamber; I mean to say by that there was no shell in it, and there was three chambers with shells and no bullets and two chambers with the bullets in that had not been discharged, . . . Sample said that while he grappled with Powell, Sullivan took something out of his pocket and then shot him. When the wounded man made that statement in the presence and hearing of Sullivan, he, Sullivan, said nothing in response to that declaration and Powell did not say anything to the statement that he, Sample, had grappled with Powell.''

Witness Rosa Cozens was a witness for defendant. She testified that when the defendants were brought to the place where Sample was lying when shot, she heard one of the defendants say that he "didn't do the shooting," and asked an officer if he, defendant, "couldn't send word home," and the officer replied, "No, shut up." Defendant testified that at that time he said to the officer, "I didn't do it, I don't know anything about it," and was told "to shut up." This, however, occurred some time before the statement was made at the hospital. In his testimony at the trial, defendant said nothing in chief or on cross-examination as to what took place at the hospital; we have only the uncontradicted testimony of the witnesses Duke, Nobmann, Millar and Flood who were at the bedside of Sample. On the cross-examination of defendant the attorney for the people asked him if he did not "hear the officer make any statement that he (Sullivan) shot him while he was grappling with Powell," but defendant's

counsel objected and the objection was sustained, probably because not proper cross-examination.

Powell's trial followed after the conviction of Sullivan and at this latter trial Powell did not testify, but Sullivan, his codefendant, was called as a witness for Powell and gave the following testimony:

"Q. Do you remember on the morning of the 11th day of August last? A. Yes, sir.

"Q. That you were at the Harbor Hospital? A. Yes, sir.

"Q. During the time that a purported statement came from the lips of Sample—deceased—I will ask you whether or not you were allowed to remonstrate or say anything for or against that statement? A. No, sir, I was not allowed.

"Q. What was it that the officer said to you? A. They told me to shut up.

"Mr. Coghlan, defendant's attorney That is all."

Why defendant did not give this testimony at his own trial is not explained. The other witnesses, present at the hospital, denied that defendant was told to "shut up." The testimony of defendant given at Powell's trial cannot be considered as rebutting the testimony of the other witnesses; as to what took place at the Harbor Hospital the testimony stands uncontradicted.

We have given this testimony in full inasmuch as defendant places his claim for a new trial in considerable degree upon the inadmissibility of Sample's statements. Passing, for the moment, the element of restraint alleged to be present in the question, the statements were admissible not as of themselves evidence of the truth of the facts stated, but simply to show what it was that called for a reply, and the action of the defendant himself under the circumstances, as indicating an acquiescence in, or repudiation of, the truth of the statements. (*People* v. *McCrea*, 32 Cal. 98; *People* v. *Ah Yute*, 53 Cal. 613; *People* v. *Amaya*, 134 Cal. 531, [66 Pac. 794]; *People* v. *Philbon*, 138 Cal. 530, [71 Pac. 650].)

It has been held that silence, when a party is under arrest, does not sustain the hypothesis of acquiescence, because the party is not free to speak. But our supreme court holds that an accusation of crime does call for a reply, even from a person under arrest. In *People* v. *Amaya, supra*, the question is fully considered by Chief Justice Beatty. So held also in

*People* v. *McCrea*, 32 Cal. 98, and *People* v. *Ah Yute*, 53 Cal. 613. It remains then to consider whether the defendant was prevented from denying the accusation made by the dying officer because of any command to defendant to keep silent, by Officer Nobmann, or because of any threatening conduct by Nobmann from which it may be reasonably inferred that defendant did not feel himself at liberty to deny the accusation so circumstantially made against him. It must be remembered that the tragedy occurred some little time before Sample was taken to the hospital. Defendant had full opportunity to reflect upon the course of conduct he would pursue while under arrest. It was not the case of an accusation made by an excited complaining party to an officer in the act of arresting or placing the accused party in confinement, when the circumstances might have accounted for the latter's silence. The wounded officer spoke with the shadow of death resting upon him and his assailant stood by with all his faculties unimpaired and so situated as to make it most natural for him promptly to deny the charge made against him. He evidently was not a timid person easily cowed into abject submission or frightened into guilty silence. According to his own testimony Sample had assaulted him and Powell with a club and he knocked Sample down just before the latter was shot. The testimony does not show that he was prevented from denying the statement of Sample or protesting his innocence of having fired the fatal shot. He was forbidden to speak to his codefendant, so as not to be heard by the officers, but we see nothing in the evidence from which it can be inferred that he was prevented from avowing innocence or denying that he did the shooting or making any other statement he might have wished to make. He was, on the contrary, invited by Lieutenant Duke to state "what he knew about the case and he declined to talk." His testimony at Powell's trial that he was told "to shut up," at most is in conflict with the testimony of the other persons present and is not given in connection with all that occurred at that time, or as to when during the time or in what relation to the attending circumstances he was told "to shut up," if it be admitted that he was so told. And as above stated, his testimony at Powell's trial has no bearing upon the question here presented. We think the testimony objected to was rightly admitted.

2. It is strenuously urged that a new trial should be granted on the affidavit of codefendant Powell that he, and not defendant, shot officer Sample.

The affidavit of Powell was made after his trial and conviction for the same crime as that charged against Sullivan, and after he was under the protection of the rule of once in jeopardy. He stated that he himself and not Sullivan fired "into the body and person of Sample"; that Sullivan "did not aid or abet in any way in the firing of the shots which caused the death of said Sample"; that he did not disclose this fact to anyone until after Sullivan's conviction and that no person knew prior to Sullivan's conviction that he, Powell, "would state that he, affiant, did fire the shots that caused the death of said Sample"; that he fired "said fatal shots in self-defense"; that no person other than himself "knew or could know, that he, affiant, did fire the said shots," and "that said Sullivan was not there present at the time and place when he, affiant, fired said shots as aforesaid and could not have known that he, affiant, did fire the said shots." Joseph Mann, bailiff in charge of Powell during the latter's trial, testified that he heard Powell state in the presence of his attorneys that he, Powell, grappled with Sample and in self-defense took his pistol away from him and shot him; that he was asked by his attorneys what he would testify to in his own behalf if he went upon the stand and thereupon made the above statement. He very prudently refrained from testifying and was convicted of manslaughter and, when arraigned for judgment, requested immediate sentence.

At Sullivan's trial, Sullivan testified to the circumstances as they occurred before and after the shooting, as he understood it, and he testified that he and Powell were together when Sample assaulted them; that in the encounter he knocked Sample down and thereupon he and Powell ran away together and that the shooting occurred after they had gotten some distance away, as he inferred, by some men he saw approaching the place where the officer lay. There can be no doubt but that each of these men knew every circumstance and fact of the affair known by the other. Sullivan testified that he did not shoot Sample, and whether true or false, he knew whether or not Powell did it. Having this knowledge, it cannot be said that Powell's statement is newly discovered

evidence. Powell was intrenched behind his judgment of conviction for manslaughter, which he quickly accepted without moving for a new trial, and was safe from further punishment in his endeavor to serve his codefendant. The trial court was in better position to judge of the truth or falsity of Powell's affidavit than we can be, and the affidavit was to be judged of by the court in connection with all the evidence in the case. (*People* v. *Merkle*, 89 Cal. 82, [26 Pac. 642].) Defendant's motion for a new trial was addressed to the sound discretion of the trial court, and the presumption is that this discretion was properly exercised in denying the motion, it appearing that Powell's affidavit was in conflict with the testimony of Sullivan and other testimony in the case. (*People* v. *Holmes*, 126 Cal. 462, [58 Pac. 917].) A motion for new trial on the ground of newly discovered evidence is looked upon with suspicion and disfavor, and a party who relies upon this ground must make a strong case, both in respect of diligence on his part in preparing for the new trial and as to the truth and materiality of the newly discovered evidence; if he fails in either respect, his motion must be denied. (*People* v. *Rushing*, 130 Cal. 499, [62 Pac. 742].) It is true that with knowledge of what Powell knew, still defendant was in no position to compel Powell to testify, as it would have tended to convict himself. This was an embarrassing situation for Sullivan and in some respects was similar to the case where a witness is incompetent and subsequently his competency is restored. But the courts have held that in this latter case the disability of the witness subsequently removed would not conclusively entitle the party to a new trial. As was said in *People* v. *Merkle*, 89 Cal. 82, [26 Pac. 642]: "Undoubtedly it was the duty of the court below, in passing upon the appellant's motion, to give most careful consideration to those affidavits, and if, when weighed in connection with the evidence given upon the trial, there would be in the mind of the judge a reasonable doubt as to the justness of the verdict, a new trial should have been granted." Each case must be determined by its circumstances, and the new trial granted or refused according to the view taken of the whole evidence, in connection with the alleged newly discovered evidence, as in this case. Granting or refusing a new trial must necessarily rest largely in the discretion of the court in which the

3 Cal. App.—33

trial has been had, and we cannot say, from the record before us, that the court failed to exercise a fair and reasonable judgment in denying the motion.

There are some other assignments of errors in excluding or admitting testimony, but they do not seem to require notice.

The judgment and order are affirmed.

McLaughlin, J., and Buckles, J., concurred.