[Criminal No. 828. Filed July 13, 1936.]

[59 Pac. (2d) 658.]

ROLAND H. COCHRANE, Appellant, v. STATE OF ARIZONA, Respondent.

Miss S. V. Ross and Mr. Fred O. Wilson, for Appellant.

Mr. John L. Sullivan, Attorney General, and Mr. Elmer C. Coker, Assistant Attorney General, Mr. Harry Johnson, County Attorney of Maricopa County, and Mr. Earl Anderson, Deputy County Attorney, for the State.

ROSS, J.—The defendant Roland H. Cochrane was convicted of murder in the first degree and his punishment fixed at death. He has appealed.

The county attorney of Maricopa county, on January 26, 1935, filed in the superior court of said county an information charging that Otis M. Phillips, the defendant, and Horace Hunter, on or about January 3, 1935, in said county, did wilfully, unlawfully, feloniously, deliberately, premeditatedly and with malice aforethought, kill and murder one Richard M. Giles.

The defendants were arraigned January 28th and entered pleas of not guilty and asked for separate trials, defendant Cochrane being represented by counsel S. V. Ross. The trial of the Cochrane case was then set without any objection, for February 12, 1935. On the day set for trial, defendant's attorneys, S. V. Ross and Fred O. Wilson, filed an unverified written motion for a continuance, to a time not earlier than March 1st, suggesting therein that they had not had time to interview witnesses nor to thoroughly study the transcript of the record of the preliminary hearing, and consequently no time to prepare for trial. The motion was overruled and the trial proceeded. This ruling is assigned as error.

One of the grounds urged in the motion for new trial is that defendant's counsel did not have time to prepare for the trial, and Attorney S. V. Ross filed

with the motion an affidavit that she was not employed until January 25th; that owing to professional engagements she could devote only a portion of her time from then to February 12th to the preparation of defendant's defense; that she was hindered in seeing and consulting with defendant, in that the keeper of the jail would not let her see him after 4 P. M.; that she did not get a transcript of the record of the preliminary hearing until February 11th, or the day before the trial commenced; that her associate, Fred O. Wilson, was not brought into the case until February 11th; that if she had been given time to interview the defense's witnesses, and to properly prepare the case, "the facts testified to would have proved that the deceased, Richard Giles, did not meet his death in the manner or at the time and place as contended by the State and that the deceased did not meet his death at the hand of the defendant."

The other reasons for the appeal, as given by the defendant, are:

The admission of evidence over defendant's objection.

The refusal to admit competent evidence offered by the defendant.

The giving of erroneous instructions.

The refusal of the court to grant a new trial on newly discovered evidence.

The misconduct of the county attorney in his closing argument to the jury, and:

"The utter physical impossibility of the deceased having met his death at the hands of this defendant, or of any other person, in the manner, at the time, and with the means and instrument testified to by . . . the only purported eyewitness of the homicide."

We think it highly proper and necessary to give a general outline of the evidence relied upon by the state for a conviction before considering the complaints of defendant.

On January 2d the deceased, who was a resident of Chandler, Arizona, left there, along about 7:30 P. M., for Phoenix, in company with Herman H. McDaniel and Lorraine Garvin, riding in a Chevrolet roadster, evidently bent on "a night out" in Phoenix. They stopped in Tempe and had a drink. Later they reached Phoenix, probably between 8 and 9 o'clock, and went to the Nanking Café and had other liquid refreshment. From there they went to the Panama Apartments and spent a little time drinking. Then they went to the Avalon Club, a barroom on South Central Avenue near Jefferson Street, where they remained until near midnight. Here they met Horace Hunter and Otis Phillips, and saw them from time to time during the evening. The deceased was engaged in gambling much of the time spent in the Avalon Club.

Around midnight it was determined that Hunter, the deceased, McDaniel and Lorraine Garvin would go to the Hunter home at 1722 East Adams Street for a visit. Deceased, McDaniel, and Garvin went in the Chevrolet they had driven from Chandler. When they arrived at the Hunter home they found Horace Hunter and his wife, Lenora, there. Hunter was fully dressed, with his overcoat on and hat in hand, but Mrs. Hunter was in bed. The deceased proposed that Mrs. Hunter go with him for a girl named Dea and to whom he referred as his "girl," whereupon Mrs. Hunter put on her shoes, slipped a coat on over her sleeping pajamas, and she and deceased left to go after this girl friend of the deceased, leaving behind in the Hunter home: Hunter,

McDaniel, and Lorraine Garvin. They got into the Chevrolet roadster out in front of the house, where it had been parked, turned on the head and dash lights, when a man stepped up on the right side of the car, and, with a gun in hand, pointing across Mrs. Hunter's lap, said, "Stick 'em up." Whereupon the deceased, after faltering and arguing with the holdup man, from where he was in the car, gave him some loose bills from his pocket. The holdup man was not satisfied and ordered the deceased to get out of the car, which he did, and he was told to come around and to hand over to the holdup man his billfold. He started around the car in the direction commanded and while so moving was shot, the bullet entering his neck and passing through in a horizontal course, wounding him so that he died where he fell in a few minutes.

Lenora Hunter, who was in the car with the deceased, testified that the defendant was the man who held up and shot deceased.

Along about 7:30 that evening Phillips, Hunter and Cochrane were at the Royal Apartments, on South Third Avenue, and were overheard discussing the possibilities of a poker game with some fourth person who was supposed to have some money. Phillips and defendant went into the bathroom, where they remained for a few minutes and, after they came out, Hunter and Phillips went away, defendant remaining until about 11 o'clock, when he left. Phillips had returned along about that time to the Royal Apartments, but whether he and Cochrane went away together is not disclosed, although they left about the same time. Near midnight the defendant Cochrane returned to the Royal Apartments and said to, or in the presence of, Bruce Cooper, Evelyn Garen and Jack, also sometimes known as Mario, Constantino,

who were rooming at the Royal Apartments, that he had to "blast" a man, at the same time placing two guns on the table and saying something about holding up a man. These persons requested him to leave, and he said he was afraid of being picked up; that he did not want to leave, but that he would leave the next day.

Defendant was arrested on January 8th and freely and voluntarily made to the county attorney on that day a full and complete confession. According to the confession, Phillips and Hunter came to the Royal Apartments about 8 o'clock the evening of January 2d, "and discussed going to Chandler or Mesa and 'sticking up' a poker game." At 11 o'clock Phillips returned to the Royal Apartments and said the Chandler man was in town; that Phillips took defendant to the Avalon Club where they met Hunter; that either Phillips or Hunter pointed out McDaniel, saying he would be at the place of the "stick up," but that he had no money; that Phillips engaged the deceased in a conversation and later told defendant he was the man who had the money; that he had about $100, and kept it in his right hip pocket; that the deceased, Hunter, McDaniel and Garvin left the Avalon Club and that he and Phillips took Hunter's car and followed them, arriving at the Hunter house just as the former were getting out of their car; that he and Phillips circled the block and stopped just west on the next street corner; that the plan was to have the holdup in the Hunter house and, to make it look good, defendant was "to cuff Hunter around a little bit." Defendant went nearly to the Hunter house and then returned to where he left Phillips, and, seeing a man and woman coming out of the Hunter house, walked up to the car and held them up; that he had two pistols in his hands; that he demanded

money and the deceased gave him $2; that he told deceased he wanted the money in his pants pocket; that he ordered deceased to get out of the car and come around in front and the deceased "had his hand in his pocket longer than he expected him to have and he shot him"; that he got in the car with Phillips and returned to the Royal Apartments; that he did not know whether he had killed the man he shot or not, as he ran away immediately.

There was introduced in evidence a letter written by the defendant from the county jail in Phoenix on January 14th to a woman friend in Ventura, California. After apologizing for running away from his parole in California, he said, among other things:

"I'm in for murder in the first degree and robbery—the least I can expect is a life sentence and from all indications I shall get the death penalty. I much prefer the latter—and yet—I'm young. I don't want to die—life is sweet to me just the same as it was to the person that was shot. You see, I'm still a coward."

It is not necessary to relate at length the details of the confession. Defendant's counsel made no objection to its introduction in evidence. At the trial the defendant admitted making the confession, but explained he had agreed with Hunter, Phillips, Harold Burke, and Jack Constantino to "take the rap" in order to save them, and upon the mutual promise of all of them to help each other.

We will consider the defendant's assignments of error, or such of them as we think deserve attention, in the general order in which they appear in his brief.
 When the case was set down for trial defendant was represented by counsel of his own selection, and he made no objection to February 12th, the date set for the trial, and, according to the record, did not suggest to the court that he would not be ready to

proceed at any time until the case was called for trial on that date. From the statement of the case it is quite apparent that 14 days, that is, from January 28th to February 12th, was long enough for defendant's counsel to interview defendant and his witnesses and to prepare such defense as he might have; and it is not apparent that a longer time to read and study the record of the preliminary hearing by his counsel would have materially assisted in his defense. While the law contemplates that one accused of crime, the guilty as well as the innocent, shall have a reasonable time to engage counsel and to prepare his defense, it does not contemplate that such person shall be coddled, indulged, or favored by an unreasonable grant of time for such purposes. If a defendant may demand, as the Constitution provides (section 24, art. 2), "a speedy public trial," we see no reason why the state should not also insist upon a speedy trial, provided always that the accused be given a fair and reasonable opportunity to prepare for his trial. The rule is that we will abide the action of the trial court on motions for continuance or postponement of trials in criminal cases, subject to review only for abuse. *Hash* v. *State, ante,* p. 43, 59 Pac. (2d) 305, decided June 29, 1936. The court did not abuse its discretion.

What we have just said is applicable to defendant's second assignment. He was not entitled to a new trial on the ground that his motion for continuance was overruled.

■■ The defendant's confession was taken down stenographically, transcribed, and the transcript was used as a memorandum by the county attorney in questioning witness Roach, who testified as to what such confession was. Defendant complains because he was not, upon his request, furnished a copy of

such transcript for use in the cross-examination of Roach. We have examined the record and fail to find any ruling of the court upon which to base this assignment. No ruling was asked and none was made. But if we concede defendant asked for a copy of the stenographic transcription of defendant's confession, and the court refused to order the county attorney to furnish him with it, we do not think the ruling was error. The law nowhere provides for the taking stenographically of confessions of defendants, and if it is done the notes are not evidence. True, they may be used to refresh the memory of the stenographer in testifying to the confession, or by the county attorney as a memorandum in questioning persons who heard the confession, but they have no probative value whatever. They are the private papers of the person or persons who take the pains and trouble of making them. *State* v. *Brake,* 99 Or. 310, 195 Pac. 583; *People* v. *Keyes,* 103 Cal. App. 624, 284 Pac. 1096; *People* v. *Emmons,* 7 Cal. App. 685, 95 Pac. 1032; *State* v. *Laird,* 79 Kan. 681, 100 Pac. 637; *State* v. *Badders,* 141 Kan. 683, 42 Pac. (2d) 943.

▮ The excerpt from the argument of the county attorney, in his closing address to the jury, complained of as not based on the facts and as prejudicial, was called to the attention of the court by defendant's counsel as follows:

"Mr. Wilson: If your Honor pleases, I think the County Attorney has argued long enough trying to convict this man of something he has already been convicted of and paid his price to the state for."

It is doubtful if this remark was intended to call for a ruling of the court, but if it was it was made after the county attorney's statement to the jury. If defendant was of the opinion that the statement was not based on facts disclosed by the evidence and

was prejudicial to his cause, he should have moved that it be expunged and the jury directed to disregard it. He did neither. Under the circumstances, no question was reserved for review. *Sullivan* v. *State,* 47 Ariz. 224, 55 Pac. (2d) 312.

■ The statute, section 5097, Revised Code of 1928, gives a number of grounds for a new trial, one of which is:

"12. When new evidence is discovered material to the defendant, which he could not with reasonable diligence have discovered and produced at the trial, and the defendant produces at the hearing of the motion the affidavits of the witnesses by whom such evidence is expected to be given. . . . "

The new evidence urged as grounds for new trial is that the defendant's codefendants, Hunter and Phillips, if a new trial is granted defendant, will testify and exonerate defendant of any connection with the killing of Giles. At the time of defendant's trial, the charges against Hunter and Phillips were pending and undisposed of. At the time of the motion for new trial and the making of the affidavits in support thereof, their cases had been disposed of, and, that being the situation, according to the affidavits they were willing to "take the rap" for defendant and say if defendant should be granted a new trial that they were the ones who killed Giles, or at least that defendant did not kill him. It is implicit that defendant knew what his codefendants knew and could testify to at and before his trial, so that the testimony of his codefendants was not new evidence discovered after his trial. But he undertakes to excuse himself for not calling Hunter and Phillips as witnesses because, according to affidavits, he was advised by their attorneys that they would refuse to testify on the ground that it

would incriminate them. We think clearly the showing was insufficient for a new trial on account of newly discovered evidence.

In the first place, the testimony of defendant's codefendants was not new evidence discovered after the trial. He must have known all the time what his codefendants would or could testify to. He asserts that while he knew it, he could not with reasonable diligence have produced it at the trial, since his codefendants would not testify under the advice of their attorneys. If that excuse is good, the evidence would be available only at the wish or whim of his codefendants and if they, or either of them, should refuse to testify it would be a ground for another re-examination of the issue between the state and the defendant. In the second place, to sustain the defendant's contention would place in the power of two or more participants in crime the chance to exonerate some of their number by others taking, in the vernacular of gangdom, "the rap." And in the third place, what it is asserted these codefendants would testify to in a new trial is so contrary to what they had theretofore said that it is very improbable the jury would give it any weight or that the verdict would have been different. We might say that the defendant failed to produce the affidavit of Phillips, as the statute requires, showing what his evidence would be on a new trial.

▆ The defendant, insisting that the evidence is undisputed that he and deceased were not acquainted with each other, assigns as error certain rulings on questions put by him to Lenora Hunter on cross-examination in an endeavor to show deceased and the holdup man were acquaintances. If defendant was able to elicit from Lenora Hunter evidence that the holdup man and the deceased were acquainted with

each other by anything that was said or done by them, it would have a tendency to show that it was someone other than the defendant who killed the deceased and defendant was entitled to show it. As we understand it, the ruling of the court was to that° effect; the controversy being as to whether defendant was trying to elicit the witness' opinion or conclusion . from what she saw rather than to have her state the facts and permit the jury to draw the conclusion. The particular question and answer involved are:

"Q. Did he (referring to the deceased) act as if he recognized the man (referring to his alleged assailant)? A. Well, the way he argued with him, it seemed like he did."

Before this question was put the witness had been asked what each said to the other and whether the holdup man had called any name. The answer was that no name had been called. On motion of the county attorney, the answer was stricken as calling for a conclusion; the court saying "She may state what he said and did." The witness then said, in answer to several questions:

"Well, I don't know that I know exactly his actions, but I was going by the sound of his voice. . . .

"Well, I don't know whether he was kind of surprised, or he just didn't know what to do, I don't know, I could not say, but it was something on that order. . . .

"Well, when he first said, 'Stick them up' he used kind of a coarse voice, and after that when he was just kind of arguing it was more just a natural voice. . . .

"Well, it was naturally an argument when he didn't give him the money and he was asking for it, but it wasn't as commanding a voice after the first time he said, 'Stick them up,' but it was plenty strong."

Wharton's Criminal Evidence (vol. 2, 12th ed., § 1013, pp. 1770–1775) states the rule as follows:

"It is generally held that a witness may testify to the emotions manifested by another and observed by him. . . . Any witness may be permitted to describe the tone, gesture, appearance and general demeanor of a person, although he cannot do so without in some degree indicating his own opinion or expression as to what they were. This is but to describe an outward manifestation drawn from observed facts, and it does not fall within the rule requiring the witness to be an intimate acquaintance to be competent to testify. . . . also, any witness may testify as to the demeanor of the defendant— whether he was intoxicated, or sober, angry, excited, agitated, surprised, or calm."

While the court's ruling may have limited the witness' observations of the conduct and manner of the deceased and the holdup man too much under the rule, we do not think, in view of the further answers made by the witness, the defendant could have suffered any harm or injury. She was permitted to describe, as best she could, the voice and manner of the parties involved.

On cross-examination the defendant asked Lenora Hunter this question: "Your husband is charged in this affair, is he not?" This was objected to by the county attorney as "arguing with the witness," and the objection was sustained by the court. The objection was groundless and the ruling of the court was error. It was certainly proper and right for the defendant to show that Lenora Hunter was the wife of Horace Hunter, one of the defendants charged with the murder of Giles. It is always proper to show the relation and interest of a witness as influencing his credibility. However, the evidence that the witness was the wife of Horace Hunter is very complete and satisfactory. She and Horace

Hunter were referred to as Mr. and Mrs. Hunter and as the occupants of the house at 1722 East Adams. The jury, when this question was asked, knew from the testimony in the case that she was the wife of Horace Hunter; otherwise the objection and ruling thereon might have been prejudicial.

■■■. The ruling of the court on questions as to the course of the bullet through deceased's neck and the level at which the gun was held when the shot was fired are complained of, but just how such ruling could have prejudiced defendant we are not told nor can we see.

■■■ Clinton Burke, a witness for the prosecution, in his direct examination testified that his son Harold Burke and the defendant came to his home in Phoenix on January 4th, between 8 and 9 o'clock in the morning, and asked for a room for a few days; the son saying "Now, this man here (Cochrane) is 'hot.' I don't want you to say anything about him being down here." On cross-examination the witness stated that these things were said to him by his son, in his kitchen while defendant was in the front room, and when that was made to appear, on motion of defendant, it was stricken. On redirect examination the county attorney asked permission of the court to refresh the memory of the witness, stating that he had his testimony given theretofore, and the court granted such permission. The witness then, in answer to questions more or less leading, said that his son told him in defendant's presence that defendant was "hot." The defendant objected to the questions on the ground that they were leading and suggestive, were cross-examination by the state of its own witness, and impeaching in character. Under the circumstances, the ruling, we think, was right.

The witness had made contradictory statements, to the surprise of the prosecution.

"The cases are practically in accord in holding that a party who is surprised by unfavorable testimony given by his own witness may interrogate such witness as to previous inconsistent statements made by him." 28 R. C. L. 644, § 228.

■■■■ Defendant was a witness in his own behalf, and on direct examination stated that he had been convicted of robbery in California, and that he left California in violation of his parole when he came to Arizona. On cross-examination he was asked quite extensively by the county attorney about his previous criminal record, the questions being:

"Weren't you convicted of a felony in Santa Barbara? . . .

"And what was the offense in Imperial, California?

"So you have served—you were convicted of more than one felony in California?

"And what was the charge upon which you were convicted? . . .

"On this other conviction, you served time, did you not?"

The objections to these questions were that they were not proper cross-examination and prejudicial, the defendant having admitted his conviction of a felony. The questions elicited from defendant that he had been convicted and sentenced for two felonies and a misdemeanor in California. Where a defendant makes himself a witness, the rule as to the extent of the inquiry as to his previous criminal doings is stated in *Garrett* v. *State,* 25 Ariz. 508, 219 Pac. 593, 594, as follows:

"Our statute provides that a defendant in a criminal action or proceeding cannot be compelled to be a witness against himself, but may be a witness in his own behalf. If he offer himself as a witness he may

be cross-examined to the same extent, and is subject to the same rules as any other witness. Section 1229, Penal Code 1913. The party against whom a witness testifies has the undoubted right to inquire of him as to his antecedents in order that the jury may know something of who he is and what he has been doing. The extent of this inquiry, it seems, is largely in the discretion of the trial court. It is always competent to inquire into a witness' previous occupation, companions and associates for the purpose of affecting his credibility.''

See, also, *West* v. *State,* 24 Ariz. 237, 208 Pac. 412; *Hadley* v. *State,* 25 Ariz. 23, 212 Pac. 458; *Johnson* v. *State,* 33 Ariz. 354, 264 Pac. 1083; *State* v. *Roselli,* 109 Kan. 33, 198 Pac. 195.

The defendant complains because the court directed the jury that if they found defendant guilty their verdict must be for first degree murder. A witness who lived near the Hunter home testified he heard, just before the shot that is supposed to have killed Giles, '' . . . a quarrel; it seemed to me like a drunken brawl; it seemed I could hear voices talking, no distinct words or nothing. I was awakened and got up and tried to place it, and I happened to look across the street and seen the light of a car.'' This statement does not in the least conflict with, or refute, or mitigate against the testimony of the witness Lenora Hunter that defendant held up and shot Giles in the act of robbing him, nor the confession of defendant to the same effect. The defendant did not ask for an instruction for a lesser degree of murder, and if he had it would have been error under the evidence to give it.

The information does not state that the killing with which defendant is charged was committed in the perpetration or attempted perpetration of robbery, but the evidence conclusively shows

such to be the fact. It is settled by a great majority of the decisions that evidence of the killing of a human being while in the act of committing robbery supports an indictment or information alleging that the killing was wilful, deliberate, and premeditated, as here alleged. *State* v. *Bolton,* 65 Mont. 74, 212 Pac. 504; *State* v. *Roselli, supra; Andrews* v. *People,* 33 Colo. 193, 79 Pac. 1031 (108 Am. St. Rep. 76); *State* v. *King,* 24 Utah 482, 68 Pac. 418 (91 Am. St. Rep. 808); *People* v. *Witt,* 170 Cal. 104, 148 Pac. 928. The court in its instruction to the jury said:

"Now, I will define to you what is known in law as murder of the first degree, so far as it applies to this case. All murder which is perpetrated or is committed in the perpetration of or attempt to perpetrate robbery is murder of the first degree."

The defendant seems to think this instruction departs from the allegations of the information, and therefore is erroneous. Section 4584, Revised Code of 1928, reads:

"All murder which is perpetrated by means of poison or lying in wait, torture, or by any other kind of wilful, deliberate and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary or mayhem is murder of the first degree, and all other kinds of murder are of the second degree."

Wilfulness, deliberation and premeditation are implied when killing is committed in the perpetration of, or attempt to perpetrate, any of the felonies named, and all that is necessary to support an information charging wilful, deliberate and premeditated murder is to prove that the killing was done by the defendant while committing, or attempting to commit, one of such felonies. *State* v. *Roselli, supra; People* v. *Witt, supra.*

■ Defendant also complains because the court defined to the jury the crime of robbery; his reason for so complaining being that the information does not charge that the killing was committed in the perpetration of robbery. We think the instruction was not only highly proper, but particularly applicable to the facts of the case.

■ Defendant also complains that the court misdirected the jury as to the law applicable to his case, as follows:

"Now, gentlemen, you are further instructed that if a human being is killed by another person while such person is engaged in the perpetration of or an attempt to perpetrate the crime of robbery, such person doing the killing under such circumstances is guilty of murder of the first degree regardless of whether the killing is intentional or unintentional."

It is claimed that such instruction was inapplicable because the information did not charge the killing in the perpetration of, or attempt to perpetrate, robbery. What we have said as to the next two preceding instructions is applicable to this one.

Defendant criticizes some two or three other instructions upon grounds similar to those stated above. We will not encumber this opinion with such instructions nor with a discussion of them, as to do so would be largely repetitious.

We have taken up and considered practically all of the assignments made by defendant. If we have omitted any it is because it seemed so elementary and trivial as not to merit attention.

■ Finally, defendant contends the evidence does not support the verdict. Under this head he contends that it was absolutely impossible for the defendant to have inflicted, or the deceased to have sustained, a horizontal gunshot wound through the

neck as described, granting that the only eye-witness, Lenora Hunter, correctly placed them and their respective movements at the instant of the fatal shot. This is not a case of self-defense. There is no question as to who was the aggressor and why. It is not a question as to who pulled first. The course of the bullet, or the angle at which the weapon was held when fired, is absolutely immaterial. Reversals are not to be had because an excited and frightened eye-witness to a killing may have failed to place the target and the assailant so that their respective positions may be definitely located from the direction and course of the bullet. Neither the assailant nor the person assailed is, under such circumstances, standing still. Their hands, their bodies, their heads, their feet are moving. In this instance, Giles had been commanded to come around the automobile to where the holdup man was standing, and was actually obeying the order when shot.

The evidence against the defendant is so direct, so positive, and so clear, and the errors in the trial so slight, that no other order than one of affirmance could reasonably follow.

The judgment of conviction is affirmed.

LOCKWOOD, C. J., and McALISTER, J., concur.