[Criminal No. 831.   Filed May 1, 1936.]

[57 Pac. (2d) 304.]

FRANK RASCON, Appellant, v. STATE OF ARIZONA, Respondent.

Mr. S. B. Rayburn and Mr. F. Preston Sult, for Appellant.

Mr. John L. Sullivan, Attorney General, and Mr. W. Francis Wilson, Assistant Attorney General, for Respondent.

McALISTER, J.—This is an appeal by Frank Rascon from a conviction of murder in the first degree and a judgment and sentence imposing the death penalty. He assigns eight errors and discusses them under five propositions of law, the correctness of which depends wholly upon the facts adduced at the trial.

It appears from the record that on the afternoon of June 11, 1935, between 1 and 2 o'clock, the defendant, Frank Rascon, his wife and father, riding in a Ford truck, drove up to the Roach Roberts' ranch house located about eight miles southwest of Beardsley, Maricopa county, Arizona, and that as they approached it the defendant, who was driving, began cursing one Joe Romero, who was employed there as a cow hand, and ordering him to open the gate. Notwithstanding his manner and language, Romero went out and opened the gate for him and as soon as his car stopped he and Romero began fighting, the latter striking him first and before he was out of the car, blacking his eye. His nose was bleeding also and before they had fought very long Mr. Roach Roberts separated them, sent Romero back to the house where he began washing dishes and, with the help of the wife and the father of Frank Rascon, succeeded in getting him back in the car, when they drove off. After the fighting had stopped the father picked up a .22 rifle lying in the front of the car and, seeing it had no cartridge, asked for one, but it was taken from him and hidden by Mr. Roberts who testified that the defendant had been drinking but was not drunk and that he (Roberts) told him to go away

from there and stay away. It appears that the father, Manuel Rascon, had worked for Mr. Roberts in the same capacity as Romero up to April 6, 1935, when his services were discontinued, and that he, with the son and his wife, camped near the Roberts' house for a time after that and then moved to a place about one and one-half miles northwest of there where they lived until June 11th.

In less than an hour after they left, while Mr. Roberts, his small son and Joe Romero were some distance from the house fixing a fence, the defendant returned to the ranch house alone, yelling as he came, and Mr. Roberts, seeing him went where he was for the purpose of keeping him and Romero apart. He had a knife in his hand, asked where Romero was and, when informed by Mr. Roberts that he was working on a fence, said: "I am going to kill that God damn Romero." He repeated this statement at least a half dozen times, whereupon his wife drove up in a car, got him in it and took him home again without his seeing Romero at all. Right after that Mr. Roberts left the ranch and went home, the gate he and Romero were fixing having been finished.

Nearly an hour later Romero went a short distance from the Roberts' house to where one Walter McCloud, with the help of two boys, Clem Miller and Fred Nowland, were extracting honey, and asked McCloud if he would let Nowland help him start the engine. Nowland was permitted to do so and about 5 o'clock McCloud went over to the pump where they were and, so far as the record discloses, he and those with him were the last persons, other than the defendant and perhaps his father, to see Romero alive.

About 9:30 the next morning Isidor Ortiz, accompanied by several other persons, drove to the Roberts' ranch to visit Romero and upon arriving there

found his body lying on the ground about fifty feet southeast of the house face downward. They immediately reported the fact to the sheriff's office and by 11 o'clock two deputies, Bill Levy and Joe Maier, together with the coroner, Frank Patterson of Glendale and Deputy County Attorney Melbourne Hill, were out there, and, after viewing the scene of the killing and the body, the latter was taken to Glendale where an autopsy was performed. It disclosed that the deceased had been shot through the lungs and the heart, the bullet's point of entrance, according to the physician and one of the deputies, being on the right side about the level of the ninth or tenth rib near or on the mid-axillary line, and its point of exit being about the level of the third or fourth rib on the left side near the same line. He also found superficial lacerations on the leg, feet, thigh and arms, and fingernail marks on the right arm and some superficial contusions on the face.

From the Roberts' house the officers went to the place where the defendant had been living but found no one home, the camp appearing to have been recently left or deserted. Frank and his father had gone to Tucson the night of the 11th, to Nogales the next day, across the line that night into Mexico where they remained for a month, or until the 11th or 12th of July, when he came from Magdalena to Nogales and over the line into Arizona, where he was arrested by three immigration patrolmen. In reply to a question by them, he said that he was the man who had shot Joe Romero near Phoenix.

A little later he told Bill Levy and Tony Orbuena, deputies of the sheriff of Maricopa county, who had gone to Nogales for him, E. B. Romero, a brother of the deceased, and a Mr. White, a deputy sheriff of

Santa Cruz county, how the killing occurred. Bill Levy testified as follows:

"We asked him what he had killed him for and he told us once that Romero had threatened to kill him, and we asked him what he left for. He said, well, they might cause him some trouble, the reason he left, and we asked him how he did it. He said he had trouble that day with Romero and then he went back to his cabin and he started down then to get some water and then he thought about what Romero told him, that Romero would kill him if he went back on the ranch, so we went back to his cabin and got his rifle and put it in his truck and went down to get some water. He said when he drove in the gate, Joe Romero was down at the pump house, and he said Joe began to pull like he had a gun down in here (indicating), and he said he told him, 'Joe, I want to talk to you,' and Joe kept coming and he fired one shot at Joe, then he said Joe kept coming towards him, and he hit him with the butt of the rifle, then Joe ran around the house and started down in the field and he shot the second time and hit him. . . .

"He told us he was running when he was shot, running from him."

The day following his return to Phoenix the same two Maricopa county deputies, together with Deputy County Attorney Melbourne Hill, took him out to the Roach Roberts' ranch where he voluntarily re-enacted the killing for them. What he did and said then was a little more in detail than his statement at Nogales but substantially the same, Tony Orbuena's narrative thereof at the trial being as follows:

"He said he came to Glendale, him and his father and his wife, he called her his wife anyway, came to Glendale for some groceries; that Roach Roberts promised his father a day's work rounding up some cattle, and he came to Glendale and he drank a few beers and he took half a gallon of wine with him, and when he got up to Torres' (Roach Roberts') ranch he called this deceased, Romero, out and he wouldn't

come out, and he laid on the steering wheel and pretty soon Romero comes out and the fight started. He said that Romero grabbed him by the hair and pulled him out of the car and the fight started. They separated some way or other and he went home, his wife and his father. Roach got him to go home. Well, he got to his camp about a mile from Roach Roberts' place and he laid down a while under a tree there, and his father went out to look for some horses and he wasn't gone over ten or fifteen minutes, and he came back and he says, 'Let's go get some water.' So they put on a three-gallon can and a five-gallon can on the truck and they started the truck and remembered that Romero told him, 'If you come back here I am going to kill you. Don't come back here anymore.' So he throwed a rifle on the truck, a 45–60; so he started to the Torres' ranch, Roach Roberts' place; so when he got to the big gate his father got off and opened the big gate and he drove in right about the middle of the center of the fence, they got in there and that this Romero was pumping water, and that Romero started toward him, motioned like he was drawing something, but he didn't see nothing, that he drawed out of his bosom here, and he come towards him about fifteen or twenty feet past a little gate, and then he said, 'I shot at him and missed him and then he came on, kept on coming towards me, and I didn't want to shoot him any more, but he got to me and I hit him with the gun twice. Then he got away from me some way or other and walked by where the horse was tied. He untied the horse and led him a little ways, and then went around the east end of the house and went through a little gate. He said, ''I am going to show you how to shoot'' and he traveled on and then he opened another big gate, when he turned around and motioned like he was going to grab something out of his bosom, I shot, I shot at him and hit him then. And then he walked five or six steps and dropped.' ''

The version of the killing given by the defendant at the trial varied but little from the statements made

by him to the officers. He testified that when they had the first trouble at the Roberts' ranch that day Romero told him that he would kill him if he came there again and due to this he placed his rifle in the truck on going back for water; that when he drove up and stopped, Romero started running toward him from the pump, threatening several times to kill him and acting as if he were going to draw a gun from his pocket, so from near the truck he shot up in the air to stop him; that Romero did not stop but came where he was standing by the truck and he (Rascon) hit him once or twice with the butt of his gun; that Romero then ran through a gate and around the east side of the house and out through another gate in the fence to the last gate, which he opened, and then turned around like he was going to take out a gun; that he was not afraid of Romero before they had the fight but was afterwards because "he told me two or three times that he was going to kill me"; that "he had killed one man and it wouldn't hurt to kill two or three more."

The places pointed out by him to the officers as those where he and Romero were when he fired the shots disclosed that there was a distance of about fifty feet between them when the first, and of nearly one hundred feet, when the second or fatal one was discharged. A fence post stood about thirty feet from the body and in a direct line between the place where it lay and the point where Rascon said he was standing when he fired the second time. A piece of fence paling or board, which had been freshly abrased, was pulled from the post by the witness Levy and introduced in evidence by the state over the objection of the defendant. Levy measured the hole or abrasion by placing a .38 caliber bullet in it

and this showed that it was made by an object some larger than that.

Two 40–60 empty rifle shells were found about ten or twelve feet apart near where Rascon was standing when the shots were fired, one by Bill Levy and the other by Joe Maier, and the defendant said they fit his gun and were the ones he shot. These were received in evidence but a loaded shell of a slightly smaller caliber than these two, which was picked up the same day by Joe Maier near the pump house, was not admitted when offered by the defendant, because, as the state contended, no witness was able to identify it as belonging to anyone and the defendant testified that he saw no pistol or rifle on the deceased.

The first assignment is that the court erred in submitting to the jury any higher degree of homicide than that of manslaughter, his contention being that the evidence discloses that the defendant was justified in taking the life of the deceased, or, at least, was guilty of nothing more than manslaughter and, this being true, that it was error to permit the jury to consider murder in either the first or second degree. The question presented, therefore, is whether the evidence supports the verdict of murder in the first degree. We think it does, because it discloses that the day of the killing the defendant made three trips from his camp to the Roach Roberts' ranch where Joe Romero was employed and that on the first of these he and Romero, due to his cursing the latter, had a fight in which he was struck by Romero and given a black eye before he was out of the car; that after fighting for a few minutes they were separated by Mr. Roberts, who sent Romero to the house and, with the aid of the defendant's wife, succeeded in getting him back in the car when it was driven off; that in less than an hour the defendant was there

again, this time alone, and when, in reply to his question as to the whereabouts of Romero, he was informed by Mr. Roberts that Romero was working on the fence, he said, while holding a knife in his hand, "I'm going to kill that God damn Romero," and then repeated this statement a half dozen times, but just at this moment his wife drove up in a car and, without his seeing Romero at all, took him away; that in a short time, or about 5 o'clock he was there for the third time in a car in which he had placed a rifle; that he stated to the witness Orbuena and others at the Roberts' ranch where they took him after his arrest that after the first shot missed deceased and he was hit twice with the butt of the gun, he walked away, went around the east end of the house, through a little gate, said, "I'm going to show you how to shoot," opened another big gate, then turned around and motioned like he was going to grab something out of his bosom; that the defendant then shot the deceased who walked five or six steps and dropped; that his statement at the trial was substantially the same as this; that he told the witness Levy and others in Nogales that after he struck Romero with the butt of the rifle he (Romero) ran around the house and started down the field when he (Rascon) shot the second time and hit Romero who was running away at the time, running from him. Under these facts the jury was justified in concluding that the defendant, after his fight with Romero, made the second and third trips to the Roberts' ranch that day looking for trouble with him and that he fired the fatal shot while Romero was nearly one hundred feet away and running from him unarmed. This being true, it is clear that the court committed no error in submitting to the jury the question of the defendant's guilt of murder in the first degree. It would have been error

to have done otherwise. When the evidence, viewed from any standpoint, will support this charge it is the duty of the court to permit the jury to pass on it, and this is true regardless of the fact that if looked upon in some other light it might show that the defendant was guilty of a lesser degree of homicide, or in fact of no crime at all. It is the province of the jury, not the court, to decide how the evidence should be regarded and, hence, what degree of homicide, if any, has been committed.

█ The defendant urges further, however, that even though it was proper to submit murder in the first degree the court denied him the right to introduce certain evidence bearing on that question and in so doing committed error. His counsel asked him the following question on direct examination and the court sustained the state's objection to it:

"Did you know at the time of your trouble that Joe Romero had been convicted of murder?"

The defendant's claim was that he acted in self-defense. His testimony relative to this phase of the case was in substance that he fired the second time, believing that he was in danger of serious bodily harm because the deceased had told him several times that he was going to kill him, that he "had killed one man and it wouldn't hurt to kill two or three more," and was then reaching as though he was going to pull a gun from his pocket and make good his threat. He claims that if he had been permitted to show that Romero had been convicted of murder and that this fact was known to him, his contention that he was justified in believing that he was in danger of serious bodily harm would have been strengthened before the jury. The fact, however, that the deceased told him that he had killed a man had already been testified to by him, and it is not

apparent how the further statement that he had been convicted of murdering that man would have added anything to what he already had said even if permitted. The important facts were that he had killed a man and the defendant knew it, and he had already reaped whatever benefit he could have derived from this fact. Hence, it was immaterial that the question was not answered, even if the *prima facie* showing of self-defense was sufficient to justify it.

██ The admission in evidence of the fence paling which had been freshly abrased by some object is assigned as error. This piece of board was attached to a fence post which stood in a direct line between the point where the body of the deceased lay and where the defendant said he was standing when he fired the fatal shot and was admitted because of its location and the fact that the abrasion or hole was such that it could have been made by a bullet from a shell of the caliber of those found there and which defendant said were the ones he shot. Whether its introduction served any particular purpose under the circumstances may be doubtful, yet it is clear that it could have done no harm. The defendant contends, however, that if it was properly admitted, the undischarged shell found near the pump the same day by one of the same officers should have been admitted also and that the failure of the court to receive it was error. Its introduction was refused because no one was able to identify it as belonging to any person, the defendant having testified that he saw no weapon of any kind on the deceased, and no arms of any kind having been found about or near him. Under these facts the shell had no connection whatever with the deceased and if a gun which took shells of its caliber had ever been on the premises and available to him,

512

the evidence did not disclose it. The ruling of the court in both instances was proper.

■ At the close of the cross-examination of the defendant the county attorney asked him this question: "Isn't it a fact that heretofore, in this court, in this cause, you have entered a plea of guilty to first degree murder?" but the court, upon the objection of defendant's counsel, declined to permit him to answer it. The defendant contends, however, that the mere asking of the question prejudiced his rights before the jury and deprived him of a fair and impartial trial, though no authorities are cited upholding this position. The state, upon the other hand, takes the position that the question was proper and, this being true, that the answer, much less the mere asking of the question, could not have had any prejudicial effect. In support of this position it cites *People* v. *Boyd,* 67 Cal. App. 292, 227 Pac. 783, 787, in which the Supreme Court of California held that when a plea of guilty is withdrawn and one of not guilty substituted the fact that the defendant pleaded guilty is admissible, and in reaching this conclusion specifically overruled *People* v. *Ryan,* 82 Cal. 617, 23 Pac. 121, stating that the announcement therein was out of harmony with what the court believed to be the correct and the better rule. In holding a plea of guilty to be an admission of the truth of the charge against him which, with the other evidence, was properly left to the consideration of the jury, the court said:

"Such an admission was not, of course, conclusive evidence against the defendant. It was competent evidence merely; its weight and sufficiency being proper subjects for consideration by the jury. [Citation.] When the fact was established that the admission had been made by the accused, the admission was not before the jury as testimony by him estab-

lishing the truth of all or any part of the allegations of the information, but the fact that he had made it was before them, and was relevant as being inconsistent with his claim to the jury that he did not obtain any money under false pretenses from the complaining witnesses, and was not guilty. [Citation.] The defendant's own admission, voluntarily made, was clearly competent evidence against him. That he made the admission in court can detract nothing from its relevancy or its competency."

The following cases are in line with this view, and our attention has been called to none to the contrary: *State* v. *Carta,* 90 Conn. 79, 96 Atl. 411, L. R. A. 1916E 634; *Ehrlick* v. *Commonwealth,* 125 Ky. 742, 102 S. W. 289, 128 Am. St. Rep. 269, 10 L. R. A. (N. S.) 995; *People* v. *Gould,* 70 Mich. 240, 38 N. W. 232, 14 Am. St. Rep. 493; *State* v. *Bringgold,* 40 Wash. 12, 82 Pac. 132, 5 Ann. Cas. 716; *People* v. *Jacobs,* 165 App. Div. 721, 151 N. Y. Supp. 522. Hence, there was no error in the mere asking of the question and under the great weight of authority there would have been none in permitting the answer to it.

■ At the close of the case an instruction as to the effect of intoxicating liquor upon the intent of the defendant to commit the crime of murder was requested by him but the court refused to give it upon the ground that there was no evidence rendering it applicable and the last assignment considered is based on this ruling. The defendant contends that the evidence was such that it became the duty of the court, under the provisions of section 4487, Revised Code of 1928, reading as follows, to instruct on it:

"*Intent, effect of intoxication.* No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any

particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act.''

The testimony on this question was slight. Roach Roberts, referring to Rascon's condition when he had the fight with Romero about 2 o'clock, testified:

''Q. At the time of this fight that you testified about on the day of the homicide, did you observe whether or not Rascon was drunk or sober? A. He wasn't drunk.

''Q. Had Rascon been drinking that day? A. He had.

''Q. What was his condition at the time of the fight with reference to being drunk or sober? A. Well, I don't know how drunk he was; I know he had been drinking.''

Tony Orbuena, in stating what Rascon said at the Roberts' place the day following his return from Nogales, testified as follows:

''Q. Just state what he said happened out there at the time of the shooting. A. He said he came to Glendale, him and his father and his wife, he called her his wife, anyway, came to Glendale for some groceries; that Roach Roberts promised his father a day's work rounding up some cattle, and he came to Glendale and he drank a few beers and he took a half gallon of wine with him.''

The defendant himself on cross-examination said:

''Q. At the time that you first came to the ranch that morning, had you been drinking? A. Yes, sir.

''Q. Were you drunk? A. When he beat me up I was pretty drunk. . . .

''Q. Then you came back a second time, didn't you? A. Yes, the first time he beat me up. I came the second time to get water there.

''Q. In between those times you saw Roach Roberts and he told you to keep away from there, and

that time you had a knife in your hand, isn't that true? A. I don't remember him telling me nothing like that.

"Q. Do you remember seeing Roach Roberts with a knife in your hand? A. I don't remember. The only thing I remember is the last time I went there.

"Q. Would you say you didn't come back to that place or near that place with a knife in your hand? A. I don't know; I was drunk and I couldn't say whether I did or not."

This testimony discloses that the defendant was drinking when he reached the Roberts' ranch from Glendale about 2 o'clock and the fight between him and the deceased occurred, but, according to Mr. Roberts, he was not drunk and while his own testimony is that he was "pretty drunk," he remembers what happened then well enough to tell the officers at Nogales and out at the place of the killing about it in detail a month later and was able also to describe it fully at the trial. His testimony discloses that his only lapse of memory, due to drunkenness, concerned his presence at the ranch the second time, which was a little before 3 o'clock, when he had a knife in his hand and asked Mr. Roberts where Romero was, telling him several times that he was going "to kill that God damn Romero." There was no evidence whatever, except that relating to his condition some hours before, that he was intoxicated when he went there the third and last time, which was around 5 o'clock, and, according to his own testimony, he remembers that, his recollection of it being so clear that he told the officers in detail a month later as well as the court and jury at the trial just how he took the life of the deceased. These facts, the trial court felt, did not show that he was intoxicated at the time of the killing and, hence, did not call for an instruction on that subject, and we are of the view that

it was justified in its conclusion. If the testimony had disclosed that the defendant was intoxicated at that time, he would have had the right to have the jury consider that fact in determining the intent with which he committed the act. In *People* v. *Hill,* 123 Cal. 47, 55 Pac. 692, 693, the court, in commenting on section 22 of the Penal Code of that state, identical in language with section 4487, *supra,* used this language:

"It has been repeatedly held that, in a trial for murder, the jury, in determining whether there was that 'willful, deliberate, and premeditated killing' which constitutes murder in the first degree, may consider the fact that the accused at the time of the homicide was intoxicated. . . .

"In determining whether or not the killing was so willful, deliberate, and premeditated as to constitute murder in the first degree, it is proper for the jury to consider how much his mental condition at the time was affected by intoxication; and, there being an express statutory declaration upon the subject of intoxication, a defendant in a murder case is entitled to have an instruction embracing such statutory declaration given by the court to the jury, where there is evidence which makes it applicable."

Since the facts did not make an instruction on the question of the intoxication of the defendant applicable, there was no error in the court's refusal to instruct on that subject.

The judgment is affirmed.

LOCKWOOD, C. J., and ROSS, J., concur.