417 P.2d 510

STATE of Arizona, Appellee,

v.

Lawrence George KRUCHTEN, Appellant.

No. 1380.

Supreme Court of Arizona.

In Banc.

Aug. 2, 1966.

Rehearing Denied Sept. 20, 1966.

Darrell F. Smith, Atty. Gen., Philip M. Haggerty, Asst. Atty. Gen., for appellee.

Laurence Davis, Phoenix, for appellant.

STRUCKMEYER, Chief Justice.

Lawrence George Kruchten, appellant herein, and Joseph William Janovic, Jr., appellant in Cause No. 1379 (decided this date), pleaded guilty in the Superior Court of the State of Arizona in and for Yuma County to the crime of first degree murder. From the judgment of conviction and the sentence of death by the administration of lethal gas, this appeal has been perfected.

The facts may at this point be briefly summarized. Appellant and Janovic, both age 22 years and residents of Chicago, Ill., had been working in California intermittently at various jobs for some months prior to the 21st day of December, 1962. While in California, they met Sally Ann Pierce, a young woman 20 years of age. Kruchten and Janovic expressed an interest in going to Florida. Sally Ann Pierce had a Chevrolet automobile and $140.00 in money and the three decided to drive to Florida in her automobile. On December 21st, they left California. Before they left, some beer and brandy were purchased and these and other intoxicating liquors were consumed during the course of that day. About ten miles outside of Salome, Arizona, in Yuma County, they stopped near a roadside rest area and the three walked about two miles out into the desert toward the nearest hill. Janovic picked up a rock and hit the deceased on the head two or three times with it. Then Kruchten took the rock and hit her twice on the head. Kruchten and Janovic went back to the car and drove away in it with the deceased's money, clothes, portable TV and record player. The clothes were thrown out of the car later that day, the portable TV was sold in Kansas City, Missouri, and the record player was disposed of at a gas station in a suburb of Chicago. Sally Ann Pierce apparently died where she had fallen. The rock which had been used as the instrument of homicide was found nearby with hair and bloodstains on it.

In the trial court, Kruchten and Janovic were charged jointly with the crime of first degree murder. They were represented by Ralph Brandt, a member of the Arizona Bar for twenty-two years. Brandt was an experienced and able general practitioner, having previously defended many criminal cases including four charges of first degree murder. In the lower court, appellants pleaded guilty and received death sentences. In this Court, appellants each employed separate counsel and filed separate appeals.

Kruchten here moved to extend the record by setting forth matters by way of affidavits and exhibits, the principal instrument being that of an affidavit by appellant in which he asserted the inadequacy of the representation of counsel in the lower court. We considered this as an improper attempt to raise facts extraneous to the record. (Facts raised by affidavits are not subject to cross-examination nor can they be determined on affidavits and counter-affidavits.) Accordingly, the motion was denied.

However, noting that Arizona has consistently held that habeas corpus may not be used to collaterally attack a judgment of conviction, Eyman v. Cumbo, 99 Ariz. 8, 405 P.2d 889; Application of Oppenheimer, 95 Ariz. 292, 389 P.2d 696; Oswald v. Martin, 70 Ariz. 392, 222 P.2d 632; State ex rel. Jones v. Superior Court, 78 Ariz. 367, 280 P.2d 691; cf. Rodriguez v. Sacks, 173 Ohio St. 456, 184 N.E.2d 93, 20 Ohio Opinions 2d 78, and considering that coram nobis was a proper remedy, Constitution of Arizona, Art. 6, § 5, A.R.S., to raise on appeal the question whether appellants were denied the effective assistance of counsel under the Sixth Amendment to the Constitution of the United States, we ordered that this cause, together with Cause No. 1379, be

# 190

returned to the Superior Court in and for Yuma County for a hearing to determine the issues raised. Being of the further view, from the assertion by appellant of the failure to be advised of the possible consequence of his plea of guilty to first degree murder that this was an attack on both court and counsel, we directed that the Honorable Ross Jones, a Judge of the Superior Court in and for Maricopa County, inquire into the issues and return to this Court findings of fact and conclusions of law relative thereto.[1]

We further ordered that upon the entering of the findings of fact and conclusions of law the State and appellants should each file with the Clerk of the Superior Court of Yuma County their objections thereto and that thereafter the record of the proceedings be certified to this Court. All findings of fact and conclusions of law were found against the appellants.[2]

While we would ordinarily affirm the judgments on the basis of our rule that the findings of a trial court will be sustained where supported by any reasonable evidence, because this is a capital case carrying the death penalty, we have independently scrutinized the record. Where there are irreconcilable conflicts in

1. Findings as to these issues of fact were directed to be made:
"1. Did the appellants' attorney fully counsel with each of them in regard to the facts and possible defenses arising therefrom before advising them to enter pleas of guilty?
"2. Were both appellants fully advised as to a possible conflict of interest relative to their degree of complicity before entering pleas of guilty?
"3. Were the appellants directly or indirectly advised by their counsel that he would not represent them or either of them unless they entered pleas of guilty?
"4. Was there a possible conflict of interest of any kind requiring independent legal advice for the appellant Kruchten?
"5. Did the appellant Janovic have the benefit of a psychiatric examination as ordered by the Superior Court?"
These conclusions of law were directed to be returned:
"1. Whether the facts and circumstances as found deprived the appellants, or either of them, of effective assistance of counsel under the Sixth Amendment to the Constitution of the United States.
"2. Whether appellants understood the effect and consequences of their pleas of guilty.
"3. Whether, under the facts and circumstances as found, the appellant Janovic should have had the benefit of psychiatric examination before entering a plea of guilty."
The findings of fact and conclusions of law requested were necessarily broad and general in formulation since there was no concrete evidence before the Court but merely suggestions of inadequacy of representation of counsel and possible sources of conflicts of interest.

2. Findings of Fact:
"1. Appellants' attorney fully counseled with each of the Appellants in regard to the facts and possible defenses arising therefrom before advising them to enter pleas of guilty.
"2. Both Appellants were fully advised as to a possible conflict of interest relative to their degree of complicity before entering their pleas of guilty.
"3. Appellants were not advised directly or indirectly by their Counsel that he would not represent them or either of them unless they entered pleas of guilty.
"4. The entire record fails to disclose a possible conflict of interest of any kind that required independent legal advise for Appellant Kruchten.
"5. Appellant Janovic did not have the benefit of the psychiatric examination as ordered by the Superior Court for the reason that the examination was waived by Counsel for the Defendant Janovic and the Yuma County Attorney before the Honorable William W. Nabours, Judge of the Superior Court, prior to the entry of the pleas of guilty for each of the Defendants."
Conclusions of Law:
"1. All the facts and circumstances as found did not deprive the Appellants or either of them of effective assistance of Counsel under the Sixth Amendment to the Constitution of the United States.
"2. The Appellants and each of them understood the effect and consequences of their pleas of guilty.
"3. From all the facts and circumstances as found the Appellant Janovic should not have had the benefit of a psychiatric examination before entering a plea of guilty."

the testimony, we have accepted the facts upon which Judge Ross Jones could have predicated his findings and conclusions.

We first consider appellant's complaint that the coram nobis proceeding was unfairly conducted by Judge Ross Jones. Two attorneys, members of the bar practicing in Yuma County, entered an appearance as attorneys for Ralph Brandt, prior counsel for Kruchten. Judge Jones permitted Brandt to testify and Brandt's attorneys to participate in the proceedings by allowing them to object to questions and, in one instance, to examine a witness. Kruchten's position is that Brandt's conduct was unethical in that it was an attempt to sustain the judgments of conviction against the interest of his former clients.

■■■ We do not think so. The assertion that counsel is incompetent or inadequate is a direct attack upon the attorney. It constitutes a waiver of the attorney-client privilege and permits trial defense counsel to defend himself. United States v. Butler, 167 F.Supp. 102 (E.D.Va., 1957), affirmed 260 F.2d 574. The duty of an attorney to a client, whether in a private or criminal proceeding, is subordinate to his responsibility for the due and proper administration of justice. In case of conflict, the former must yield to the latter. Canon 37, Canons of Professional Ethics of the American Bar Association specifically recognizes that, "If a lawyer is accused by his client, he is not precluded from disclosing the truth in respect to the accusation." Brandt had not only the right but the duty to appear, to testify and to otherwise participate in the proceeding in such manner as the presiding judge felt was appropriate under the circumstances.

■■■ The assertion that Judge Ross Jones showed prejudice against the appellants by permitting Brandt to remain in the courtroom during the hearing is without merit. It is always within the sound discretion of the trial court to determine against whom the rule of exclusion shall be invoked. State v. Sowards,

99 Ariz. 22, 406 P.2d 202; State v. Romero, 85 Ariz. 263, 336 P.2d 366.

In considering the attack now made on the findings and conclusions, we recognize that claims by convicted felons that their defense counsel were ineffective or incompetent are common. It lies behind a defendant's natural inclination to bring hindsight to bear on his lawyer's performance and often contains his second thoughts concerning his plea of guilty and the advice of counsel which led to it. See Kamisarr, The Right to Counsel and The Fourteenth Amendment, 30 U.Chi.L.Rev. 1. It has been noted before that the willingness of courts to consider claims of inadequate trial representation invites a change of counsel and results in the actual trial of the former attorney. State v. Benson, 247 Iowa 406, 72 N.W.2d 438, 441; and see, Waltz, Inadequacy of Trial Defense Representation as a Ground for Post-Conviction Relief in Criminal Cases, 59 Nw.U.L.Rev. 289.

Kruchten filed objections to each of the findings of fact one through four. A consideration of these findings and the objections which are directed toward them requires a further examination of the facts. After appellant and Janovic left Arizona, they drove in the Pierce car to Chicago, arriving there Christmas Eve day, December 24, 1962. On the evening of March 19, 1963, certain agents of the Federal Bureau of Investigation, being then armed with a warrant for the arrest of both Kruchten and Janovic on the charge of interstate transportation of a stolen vehicle, went to an apartment in Chicago, Illinois, and arrested Kruchten. A few hours later, Janovic was arrested at the same address. Both Janovic and Kruchten were interrogated by agents of the Federal Bureau of Investigation and at about 3:00 a. m. of the following morning gave signed, written confessions acknowledging the murder of Sally Ann Pierce.

In his attack on the adequacy of his representation in the lower court, Kruchten dwells at length on the fact that at no time was the information in this case read to

him nor did he have a copy of it; that when he pleaded guilty he did not know that he was pleading guilty to a charge of wilful, deliberate and premeditated killing and that he would not have pleaded guilty to such a charge for the reason he never premeditated the death of Sally Ann Pierce. At the coram nobis hearing, he testified that he had no recollection of planning the assault and that had these facts been adequately presented in a jury trial he would have been convicted of no more than second degree homicide or possibly even manslaughter.

In Arizona, by A.R.S. § 13–452,

"A murder which is perpetrated by means of poison or lying in wait, torture or by any other kind of wilful, deliberate and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary or mayhem, is murder of the first degree. All other kinds of murder are of the second degree."

■ Prior to sentencing and on three different occasions, both Kruchten and Janovic acknowledged striking Sally Ann Pierce on the head with a rock the size of a softball. She was then left unconscious and bleeding to die on the desert. Kruchten and Janovic returned to her automobile and departed in it with her money and other property. The facts of this homicide permit of only one conclusion. As a homicide perpetrated in the course of a robbery, wilfulness, deliberation and premeditation are implied.

"The information does not state that the killing with which defendant is charged was committed in the perpetration or attempted perpetration of robbery, but the evidence conclusively shows such to be the fact. It is settled by a great majority of the decisions that evidence of the killing of a human being while in the act of committing robbery supports an indictment or information alleging that the killing was wilful, deliberate, and premeditated, as here alleged. [Citation of cases.] * * *

"Wilfulness, deliberation and premeditation are implied when killing is committed in the perpetration of, or attempt to perpetrate, any of the felonies named, and all that is necessary to support an information charging wilful, deliberate, and premeditated murder is to prove that the killing was done by the defendant while commiting, or attempting to commit, one of such felonies." Cochrane v. State, 48 Ariz. 124, at 141, 142, 59 P.2d 658, at 665.

■ Manifestly, if appellants had pleaded not guilty, a challenge to the information as a variance between proof and alleganda would have been futile. We fail to see how the claim of incompetency or inadequacy of Brandt's representation is established by asserting now that he should not have permitted them to plead guilty to premeditated murder.

We are not, however, as much concerned with this aspect of the case as with the fact of Kruchten's assertion that they were told by Brandt that on pleas of guilty they would get life and would be out in eight years. It was for this reason that we directed Judge Ross Jones to determine whether the appellants, and each of them, understood the effects and consequences of their pleas.

Krutchen testified at the coram nobis hearing:

"Q Mr. Kruchten, when did you first realize that the death penalty was a possibility in this matter?

"A After it happened, sir.

"Q And as I take it your testimony is that it was on July 26th, the day the sentence was imposed?

"A Yes, sir.

"Q That is the first time you realized there was even a possibilty that the death penalty might be imposed?

"A Yes, sir.

"Q And prior to that time what possible penalty was involved in your mind?

"A You mean what I thought I would get?

"Q What you thought you might get as a result of the action that was against you.

"A Life in prison.

"Q Was there any other possible sentence?

"A No, sir.

"Q That was the only possible sentence that there was?

"A Yes, sir.

"Q Are you sure that Mr. Brandt never explained the charges to you and the possibility of the death penalty?

"A Yes, sir.

"Q You are sure?

"A Yes, sir.

"Q Are you sure that the Judge who set [sic] upon the bench at no time explained to you that there was a possibility that the death penalty might be imposed, or don't you recall?

"A I cannot recall him ever saying anything.

"Q Are you sure that the Judge before accepting the plea of guilty did not explain to you the nature of the charge against you, or don't you recall?

"[Objection, which was overruled]

"[COUNTY ATTORNEY]: Do you recall my question?

"A No, sir, I don't.

"[COUNTY ATTORNEY]: Would the reporter read it for us, please?

"(Thereupon, the pending question was read by the Reporter.)

"A Sir, I don't recall."

Similarly, Janovic testified that he was never told of the possibility of a death sentence.

We first express doubts that a person such as Kruchten, who had little more than a grammar school education, could be unaware of the possible death penalty for murder. But irrespective, the record does not lend any credence to their testimony. Prior to sentencing and at the start of a hearing in mitigation of the offense, the following occurred:

"THE COURT: * * * Joseph William Janovic, Jr., and Lawrence George Kruchten, I must inform you and each of you individually that the County Attorney of this County on the 14th day of June, 1963, filed an Information in this Court against you and each of you jointly and individually wherein you were accused of the commission of the crime of first degree murder, a felony. You appeared before this Court on the 26th day of June, 1963, accompanied by your Counsel, and were duly arraigned on the charge filed against you therefor and, at your request, the matter was continued until the 16th day of July, 1963, when you both again appeared before the Court accompanied by your Counsel, for the purpose of entering a plea to the charge made against you by the State.

"Upon being asked what your plea was, you, and each of you, wished to enter a plea of guilty to the offense charged, to-wit, murder of the first degree. The Court first satisfying itself by interrogating each of you individually that you fully understood the nature and meaning of the charge made against you, together with the meaning of the plea of guilty, *and you were fully aware of the penalties provided by law as the punishment of said crime,* and that said plea was entered freely and voluntarily by each of you without any promises or threats being given or made by any person whatsoever, the Court caused a plea of guilty to murder of the first degree to be entered of record as the plea of each of you to the offense charged by the Information.

"It is now the judgment of this Court that you, Joseph William Janovic, Jr., and Lawrence George Kruchten that you are guilty of the crime of murder of the first degree, a felony.

"Do you have any legal cause to show why sentence should not now be pronounced?

"MR. BRANDT: No legal cause.

"THE COURT: You have further matters to present to the Court before imposition of sentence?

"MR. BRANDT: Yes, I do have." (Emphasis supplied.)

The statement by the trial judge prior to the hearing in mitigation is corroborated by the reporter for the Yuma Daily Sun who was present at the arraignment of appellants. He testified:

"Q Did Judge Nabours question the defendants individually?

"A Yes.

"Q Did he question them further than the question and answer that you have previously given?

"A Yes.

"Q What was his further inquiry of the defendants?

"A He inquired whether or not they understood that the death penalty could be imposed.

"Q Did he ask this question of both defendants jointly, or did he ask it separately of them?

"A I can't say for certain that he asked them separately.

"Q Did the defendants reply to this inquiry?

"A Yes.

"Q Did they reply through counsel or individually?

"A They replied individually because he was questioning them individually.

"Q Do you recall what their reply was?

"A They replied, 'Yes'."

Moreover, appellants, at least Janovic, had a lawyer by the name of Seaman when they appeared before the United States Commissioner after their arrest on the charge of interstate transportation of a stolen vehicle in Chicago and another lawyer by the name of Gillin who appeared at the time of their hearing on extradition to Arizona.

It is impossible to believe that appellants were unaware that the death penalty could be imposed for murder. The blatant perjury here evidenced casts doubt on each and every statement of appellants. For example, if Kruchten and Janovic knew they were subject to the death penalty for murder in Arizona, then they must have known, as Brandt testified, that the principal objective of the defense was to secure a sentence of life imprisonment.

By our requested finding of fact No. 1, we asked Judge Ross Jones to determine whether Brandt fully counseled with each of the appellants in regard to the facts and the possible defenses arising therefrom before advising them to enter pleas of guilty. We considered that such a determination was a necessary predicate for the requested conclusion of law No. 2 as to whether the appellants understood the effect and consequences of their pleas of guilty.

These further facts support Judge Ross Jones' finding No. 1 and conclusion No. 2 as against what Kruchten's present counsel labels a "walk through" defense. Yuma County has a population of 46,285 and is approximately 10,000 square miles of what is principally desert (census of 1960). It borders on the Colorado River adjacent to the State of California. Its largest city is Yuma, the county seat, a city of about 26,000 people.

Brandt's employment as defense counsel came about in this manner. He received a telegram asking whether he could take the case defending Joseph Janovic, Jr., then being extradited to Arizona, signed by Joseph Janovic; that he had read about the homicide in the Yuma Daily Sun and upon receipt of the telegram went to the office of the county attorney to inquire into what information he had as to the offense. As nearly as could be recalled, the county attorney had the statements from the Federal Bureau of Investigation and Brandt was permitted to read them and they discussed the content; that he was a personal friend of the sheriff and he went to the sheriff's

office to see what background he could obtain.

Brandt stated that when he had finished his investigation, he knew everything that was against "the boys" he had to defend. Thereafter, he called Chicago on the telephone and talked with Janovic's mother. He explained to her that he had investigated the facts of the case, that he did not believe he could secure an acquittal and reached the tentative conclusion that the principal effort should be directed toward escaping a death penalty, that his acceptance of employment at this time was conditional upon the ultimate decision as to what course the defense should take.

Appellants arrived in Yuma sometime during the course of the night of the 24th day of May. They were taken at 9:30 the following morning to the office of the justice of the peace for their preliminary arraignment on the charge of first degree murder. Brandt went to the county jail about 8:30 and talked briefly with Janovic and thereafter went with them to the justice of the peace. There he asked for a short continuance while he consulted with Kruchten. On his advice, the preliminary hearing was waived by both appellants. Brandt took the position that the principal value of a preliminary hearing to an accused was the ascertainment of the facts against him; but here, there was tactical advantage in preventing repetitious newspaper stories about the murder.

Brandt testified that while, at this time, he did not discuss with Janovic the difference between first and second degree murder, he did discuss with him the two alternatives so far as penalties were concerned to the charge of first degree murder. On their return from the justice court and after walking back to the jail with appellants, he stood in the hallway and discussed the "pros and cons with each of them, and went over the major details."

An information was filed in the superior court on the 14th day of June and appellants were arraigned there on the 26th day of June. In the intervening twelve days, Brandt decided that the best course of action was to enter pleas of guilty. Prior to the arraignment in the superior court, the defendants were brought to a counter in the sheriff's office where Brandt talked with them and he went with them into the sheriff's private office and obtained the statute on homicide and explained to them what the various degrees of homicide were and what the consequences were, including the penalty for first degree murder as being either life or death sentence. He stated that it was his opinion they understood the nature and consequences of what he was recommending be done.

At the arraignment on June 26th, Brandt attempted to enter pleas of guilty to second degree murder which were not acceptable to the county attorney and hence refused by the court. Thereafter, on the 16th day of July, pleas of guilty were finally entered to the charge of first degree murder. Up to that time, Brandt had not determined how "to go about" the leniency hearing. As he explained, he could have used the device of a not guilty plea and presented mitigating circumstances to the jury and made a plea of second degree or for a recommendation of life imprisonment; or he had the alternative of entering pleas of guilty and after a leniency hearing the sentence would be determined by the judge, pursuant to A.R.S. § 13-453. It was Brandt's final judgment that the appellants would be better off to have their sentence determined by the court, after a plea, rather than by the jury after a trial. This decision was conveyed to the appellants at the jail. Thereafter, appellants entered pleas of guilty and the trial court fixed a time for a hearing in mitigation and the passing of sentence.

At the hearing in mitigation on the 24th day of July, 1963, both Janovic and Kruchten testified. Janovic stated that at Salome, Arizona, they discussed Sally Ann Pierce as a poor traveling companion and decided that they would knock her out and take her automobile, going on without her, and that the walk into the desert was for that pur-

pose. Janovic denied that there was any intention to kill Sally Ann Pierce.

▆▆▆▆ Kruchten testified that he did not remember the conversation with Janovic at Salome. However, the act having occurred on the desert and there being no other means than the Pierce vehicle in which to leave, an intention to take the Pierce automobile is irrefutably apparent. The jury may not be instructed on a lesser degree of murder than first degree where, under the evidence, it was committed in the course of a robbery. State v. Folk, 78 Ariz. 205, 277 P.2d 1016; Burgunder v. State, 55 Ariz. 411, 103 P.2d 256; State v. Cochrane, supra. On a trial on pleas of not guilty, appellants would have been faced with the certainty that the case would have been submitted to the jury solely on the alternative instructions of first degree murder and not guilty.

▆▆▆▆ Kruchten argues, however, that his intoxication would have required the submission of manslaughter and second degree murder verdicts. By statute, A.R.S. § 13-132, no act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such a condition but intoxication may be taken into consideration in determining the purpose, motive or intent with which the act was committed. Of this statute we have repeatedly held that testimony by a defendant that he had been drinking did not raise an issue to be submitted to a jury where the accused was able to remember the factual details of the offense. State v. Roqueni, 94 Ariz. 72, 381 P.2d 757, cert. den. Roqueni v. Eyman, 375 U.S. 948, 84 S.Ct. 359, 11 L.Ed.2d 278, and Rascon v. State, 47 Ariz. 501, 57 P.2d 304.

Here, Kruchten remembers stopping at the roadside rest area, crawling under a barbed wire fence and walking into the desert. He remembers that he was ahead, that Sally Ann Pierce was following and that Janovic was behind when Sally Ann Pierce was first struck by Janovic, that Janovic gave him the rock with which he struck her on the head, that she was not dead when they left her and that thereafter he discarded his shirt because there was blood spattered on it.

Brandt testified:

"A The first defense—I wouldn't say the first defense, but a defense was the boys were so intoxicated that they didn't know the nature of their act or they were so intoxicated they couldn't form the necessary intent to be involved either in the commission of the felony or of the premeditated homicide. This was studied by me at length, and up to the 16th day of July it was not resolved into what way—whether I would take this to the jury or leave it as a mitigating circumstance to be determined by the Court."

We do not think that Brandt was incompetent or inadequate as an attorney, as appellant urges, because he did not plead Kruchten not guilty and raise a defense of intoxication. Every experienced criminal lawyer is aware that juries seldom give more than scant consideration to a plea that the accused committed the criminal act while or because he was intoxicated. The probability was that, if rejected, the jury would impose the death penalty on the facts of such a brutal killing. Realistically, Kruchten's problem is that Brandt was too competent to be long misled by the hope that the claim of intoxication had any serious merit.

▆▆▆▆ It is argued that Brandt could not have fully counseled with Janovic and Kruchten on possible defenses because, in order to make out a prima facie case, the State would have had to rely on the appellants' confessions and that the confessions could have been suppressed under Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479. Assuming without deciding that the confessions could have been suppressed, the weakness of the argument lies in the assumption that the State, if compelled to a trial by pleas of not guilty, would have been unable to make out a prima facie case of murder.

As to this, the county attorney stated to the court at the hearing on mitigation that

on the morning of the 21st of December, 1962, at about the hour of 8:00 or 9:00 o'clock, Sally Ann Pierce and the two appellants went to a friend's home where two friends of the deceased's were told that the three were going to Florida. The county attorney further stated that on the 28th of December, 1962, in Chicago, appellants robbed a finance company and left the scene in the Pierce automobile which was shortly afterwards found abandoned. The evidence of the three leaving California together, of the arrival of appellants in Chicago on Christmas Eve or shortly thereafter without Sally Ann Pierce, of her death on the desert, of the bloodstains and hair on the rock found next to her body, of the theft of her money, automobile and other property, would establish a prima facie case of murder for robbery.

The principle here controlling is that a conviction will be held invalid only if the representation by counsel was a farce or a sham. Dodd v. United States, 321 F.2d 240 (C.A.9, 1963); Rivera v. United States, 318 F.2d 606 (C.A.9, 1963); O'Malley v. United States, 285 F.2d 733 (C.A.6, 1961); Trammell v. State, 276 Ala. 689, 166 So.2d 417 (1964); People v. Robillard, 55 Cal.2d 88, 10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R. 2d 1086, cert. den. 365 U.S. 886, 81 S.Ct. 1043, 6 L.Ed.2d 199; People v. Strader, 23 Ill.2d 13, 177 N.E.2d 126 (1961); Bryant v. Warden, 235 Md. 658, 202 A.2d 721 (1964); King v. Commonwealth, Ky., 387 S.W.2d 582 (1965).

For example, in O'Malley v. United States, supra, the Sixth Circuit said:

"Appellant's counsel was of his own choosing. Under such circumstances the rule has been often stated that only if it can be said that what was or was not done by the defendant's attorney for his client made the proceedings a farce and a mockery of justice, shocking to the conscience of the Court, can a charge of inadequate legal representation prevail. [Citation of cases.]" 285 F.2d 733, 734.

We conclude that there is nothing now before this Court to support the charge that the representation by Brandt was a farce or a sham or shocking to the conscience. The plain truth is that the unvarnished facts afforded no meritorious defense. Brandt's advice to enter pleas of guilty was founded upon the obvious hope that the court would be merciful in not inflicting capital punishment. It was a strategical decision—how to make the best out of what was a nearly hopeless situation. Strategical decisions are not the kind which courts permit convicted felons to indulge in second guessing. United States v. Stoecker, 216 F.2d 51 (C.A. 7, 1954); Application of Tomich, 221 F.Supp. 500 (D.C. Mont., 1963); Casey v. Overlade, 129 F. Supp. 433 (D.C.Ind., 1955).

"Advocacy is a skill and art; easy to criticize, difficult to fairly appraise. Indeed a post-mortem of criminal trials, selected at random, would undoubtedly reveal flaws of varying magnitude in the trial techniques of respected members of the bar. Our profession is one in which hindsight is a meager measure of counsel's competency. Trial strategy is seldom viewed with a uniform eye." United States v. Stoecker, supra, 216 F.2d at 52.

Closely allied to finding of fact No. 1 was our requested finding of fact No. 3 as to whether appellants were advised directly or indirectly by Brandt that he would not represent them or either of them unless they entered pleas of guilty. We considered that this could be a form of coercion, depending on the circumstances, which might cause appellants to enter pleas of guilty.

Brandt testified concerning his first conversation with Janovic after extradition from Illinois:

"My recollection, and again I don't say that my recollection is right and Mr. Janovic's wrong, is that I walked in and introduced myself and told him that I had been retained by his parents to represent him. I said my representation is conditional upon the understanding with your parents that the best—that what I'm going to try and work for, the best I can do for you in my present opinion, the way the

198

record now looks, is that I will try to work for procuring for you a sentence of life imprisonment."

Brandt also testified:

"Throughout my entire representation I was under the impression that they had entire faith and confidence in my representation and they were entirely cooperative. They left every phase of the proceedings to me. And everything that was done was done upon my recommendation, and my suggestions were followed a hundred percent of the time and I don't believe there was—either one of them ever made any suggestion on their own or any representation as to what should be done other than you do what you think best. * * *"

■ The inference we draw is that appellants were in precisely the same position as any other defendant in a criminal proceeding. They were compelled by force of circumstances to rely upon their lawyer for advice and counseling and for recommendations as to the strategy and tactics which the representation would take.

When Brandt went over to the county jail on the morning of May 25th, before the preliminary hearing, and talked to Janovic, he was asked by Janovic, as Janovic testified:

"Sir, I asked him if he would represent Lawrence Kruchten, that he didn't have any money or didn't have the finances to hire a lawyer. And I believe he said he would talk to Larry about it."

Kruchten testified:

"—Mr. Brandt introduced himself to me then, and he asked me if I had a lawyer I believe, and I told him no. And he said, 'as long as I'm defending Janovic I'll defend you, too.'"

* * * * * *

"Q Now going back to this conversation with Mr. Brandt in the Justice courtroom do you recall him saying to you that he was taking your case only on the condition that you enter a guilty plea?

"A No, sir.

"Q Do you recall him making that statement or a statement to that effect to you at any time?

"A No, sir."

From the testimony, it is clear there was no direct compulsion by Brandt to plead guilty.

■ To sustain a charge of indirect compulsion sufficient to reverse these convictions, we are of the view that the representation by Brandt must have contained some element of fact or nondisclosure of fact which would tend to mislead appellants thereby inducing them to enter pleas of guilty. Such does not exist here.

■ Brandt was initially contacted by Janovic's parents and, in response to their telegram and a telephone call from Chicago, talked to Mrs. Janovic. Mrs. Janovic testified at the coram nobis hearing that:

"And he said that if he took the case Joe would have to plead guilty. And since it was not premeditated the law in Arizona had a sentence of life, but that wasn't as bad as it sounded because they work off time some way and they are given days off for the days that they work, and it would come to about eight years imprisonment, which was a great relief. And he said he still didn't know if he would take the case, that he would see Joe and form his own opinion of Joe first to see if he would take the case."

Brandt testified regarding this first phone conversation with Mrs. Janovic that,

"It's my recollection that I returned that call on the 17th [May] and told her that I would accept the representation on one condition, that condition was that they understand that I did not believe that I could secure a verdict of not guilty for the boys. I couldn't get them out of it, and that my representation would be pointed towards obtaining for the boys a sentence of life imprisonment."

Brandt further testified:

"Through my entire representation with the boys and their parents the question was life imprisonment or death. * * * what I was trying to accomplish

for them was at best was life imprisonment."

Brandt's testimony is supported by his letter dated July 16, 1963, to Mrs. Janovic:

"As per my advice by telephone today, the case has been set down for hearing to determine the sentence on the 26th day of July, 1963. This hearing will be the only one had in the matter, and will be probably concluded by the imposition of sentences of life imprisonment or death."

We do not find any misrepresentation or nondisclosure of the possible consequences of the pleas of guilty which would indirectly coerce appellants into entering such pleas.

The argument that Brandt spent very little time in the county jail with them proves no more than what was glaringly apparent. After their acknowledgment as to how the homicide was committed, there was very little to be further discussed about the facts. The problem was, as Brandt said, what could be done to prevent death sentences.

We now reach the most difficult area of resolution in this case. By our requested findings of facts Nos. 2 and 4, we indicated that this Court was interested in any possible conflict of interest in the representation of the two appellants and, in particular, whether there was a possible conflict of interest which required independent legal advice for appellant Kruchten. A consideration of the merits of the claim of a conflict of interest, however, cannot be wholly separated from the question of the asserted incompetency or inadequacies of the representation and the two are discussed together.

■ The leading case on conflict of interest is Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680. There, under an indictment of conspiracy to defraud the United States, the Federal District Court required Glasser's lawyer to also represent a co-defendant. It was held that this deprived Glasser of the right granted by the Sixth Amendment to the Constitution of the United States to have the assistance of counsel for his defense in that the assistance must be unimpaired by a simultaneous representation of conflicting interest. The court said:

"To determine the precise degree of prejudice sustained by Glasser as a result of the court's appointment of Stewart as counsel for Kretske is at once difficult and unnecessary. The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." 315 U.S. 60, 75–76, 62 S.Ct. 457, 467.

Plainly, where a lawyer undertakes to represent two or more co-defendants and an actual conflict of interest exists, courts will not weigh the quantity of prejudice which may have resulted to one or the other. Reversible error will be presumed. But an actual conflict must, in fact, have existed or been inherent in the facts of the case from which the possibility of prejudice flowed.

■ From our examination of the precedents, we have reached the conclusion that an attorney may, in good faith, represent co-defendants until such time as a conflict arises or can reasonably be foreseen. As a minimum, it then becomes incumbent that independent legal advice be provided for one or the other. See, for late cases finding a conflict, Sawyer v. Brough, 358 F.2d 70 (C.A.4, 1966); Campbell v. United States, 352 F.2d 359 (C.A., D.C., 1965); Randazzo v. United States, 339 F.2d 79 (C.A.5, 1964); Case v. State of North Carolina, 315 F.2d 743 (C.A.4, 1963); Porter v. United States, 298 F.2d 461 (C.A. 5, 1962); Tucker v. United States, 235 F.2d 238 (C.A.9, 1956); Craig v. United States, 217 F.2d 355 (C.A.6, 1954); United States ex rel. Watson v. Myers, 250 F.Supp. 292 (E.D., Pa., 1966); Holland v. Boles, 225 F.Supp. 863 (N.D., W.Va., 1963); and for late cases finding that there was not a conflict, see Lugo v. United States,

350 F.2d 858 (C.A.9, 1965); Peek v. United States, 321 F.2d 934 (C.A.9, 1963); Chavira Gonzales v. United States, 314 F.2d 750 (C.A.9, 1963); Wynn v. United States, 107 U.S.App.D.C. 190, 275 F.2d 648 (1960); United States v. Langston, 194 F.Supp. 891 (W.D., Pa., 1961); United States v. McClellan, 194 F.Supp. 128 (W.D., Pa., 1960).

▮ Brandt was aware of the problem of potential conflicts in the representation of joint defendants. On June 27, 1963, the day after he attempted to plead appellants guilty to second degree murder, he wrote a letter to Mr. and Mrs. Janovic, a copy of which was sent to Mrs. Lawrence Kruchten, wife of appellant Kruchten. It stated, in part:

> "At the moment, I am representing both boys because there appears to be no antagonistic interests between the two. Their statements indicate an exact degree of guilt. If one is given a life term, the judge could not in good conscience fail to give the other a life term. It is for that reason that I appeared for both of them. The moment there might be any question on this, I will have the court provide Lawrence an independent attorney."

In passing, it may be observed that it could work the other way. If one was given a death sentence, the judge, in good conscience, could hardly fail to give the other a death sentence. Nevertheless, it is clear Brandt was alert to the dangers inherent in dual representation.

Counsel for Kruchten argues extensively facts which, he believes, would have indicated a lessening of moral responsibility concluding that if Kruchten had had separate counsel he would have been advised to enter a plea of not guilty for the reason that a jury would likely have treated Kruchten differently than Janovic. Kruchten's position, while ostensibly reasonable, has no sound legal basis.

A.R.S. § 13-454 provides:

> "Upon a trial for murder, the commission of the homicide by defendant being proved, the burden of proving circumstances of mitigation, or circumstances that justify or excuse it, devolves upon defendant, * * *."

In Campbell v. Territory, 14 Ariz. 109, 125 P. 717, a first degree murder in which the jury imposed the death penalty, the argument was made that certain "matters ought to be heard as some evidence to weigh with the jury in fixing the quantum of the punishment." After an extensive discussion, this Court concluded, with this statement:

> "We have no hesitancy in adhering to and giving our approval of the doctrine that evidence in mitigation to be relevant must tend to throw some light upon the guilt or innocence of the accused, including the proper grading of his offense, should he be guilty of any, but, when not of such a character, it is not relevant simply for the purpose of mitigating the *quantum* of the punishment." (Emphasis in original.) 14 Ariz. 109, 117, 125 P. 717, 721.

▮ At a trial, the commission of a homicide having been established, the circumstances of mitigation must be confined to those surrounding the commission of the offense and relevant within the res gestae thereof, including, of course, those circumstances, of which there are none here, which might reduce the grade of the offense from first degree to second degree or manslaughter. Evidence is not relevant simply for the purpose of mitigating the severity of the punishment. State v. Narten, 99 Ariz. 116, 407 P.2d 81, 82.

▮ Conceivably, it might be argued to a jury from the facts of the homicide that Janovic was the dominant personality, but evidence that Kruchten was always more of a follower than a leader by a former school teacher is plainly not relevant, neither would be the testimony of Kruchten's wife that Janovic was with Kruchten on the majority of occasions when he became intoxicated; nor would testimony be admissible that Kruchten had no

previous record of violence and that Janovic had.

Were Kruchten able to introduce to a jury mitigating evidence of this nature, obviously the State should be permitted to show evidence in aggravation in rebuttal. The State might have established, for example, that Kruchten had been using intoxicating liquors from the age of fourteen years; that he was a high school dropout but had opportunities in the navy for further education of which he did not avail himself; that when the murder was committed, Kruchten was married to a nineteen-year old girl who at that time had had two children by him; that he did not live with her or provide her with a home; that although he doubtlessly could have found employment in Chicago, he joined Janovic in California, roving about and working irregularly.

 Circumstances in either mitigation or aggravation are not admissible on a trial unless relevant to determine the guilt or innocence. They may be admissible to determine the extent of the punishment after pleas of guilty in a first degree murder case. State v. Levice, 59 Ariz. 472, 130 P.2d 53. This latter course was the one chosen by Brandt. We find no conflict between the appellants prior to the decision to enter pleas of guilty.

Kruchten introduced in evidence at the coram nobis hearing certain letters which he had written to his wife while in the Yuma County jail. These letters indicated that Kruchten wanted his wife to obtain the services of a lawyer from Phoenix for him. On July 5th, he wrote:

"Hon if you can try to get me that lawyer from Phoenix, because you can see very plainly just what that lawyer we have now has in mind for me, and if possible, I want a good lawyer not one of those court appointed fools but if you cannot get one I will have to take my chances and hope for the best."

When Kruchten was asked what he had in mind when he wrote, "because you can see very plainly just what that lawyer we

have now has in mind for me," he answered, "I cannot recall what I had in my mind at that time." On July 9th, he wrote:

"I am just about ready to call it quits, because I don't know whats going on or who I will have to defend me. All I do know is I am not going to have the same lawyer that Joe has, I would be safer if I defend myself."

At the coram nobis hearing, this statement was read to Kruchten and his counsel asked him this question:

"Q Yes. I have just read a statement from your July 9th, letter, and do you recall what you meant by that.

"A Off hand—no.

"Q Did you mean that you had so little confidence in Mr. Brandt that you thought you would stand defenseless before the judge and he could do anything he wanted to?"

After an objection was made as leading, Kruchten was allowed to answer:

"A Sir, I had no confidence in Mr. Brandt."

 Why Kruchten had no confidence in Brandt was not explained. It is plain that Kruchten had doubts, possibly concerning Brandt's strategy of pleading guilty, possibly because Brandt was unable to promise a miracle. We can sympathize with his desire to have a good lawyer and his reluctance to plead guilty, but due process does not require that a defendant be furnished a lawyer of his choosing. See People v. Mattson, 51 Cal.2d 777, 336 P.2d 937. Kruchten was aware that he was entitled to other counsel and that the court would appoint him a lawyer. Rather than have a court-appointed lawyer, he chose to take his chances with Brandt "and hope for the best."

 We do not think the test of a conflict in interest can be decided on an accused's subjective mental reservations as to whether his lawyer is going to be able to accomplish the result he would like to see.

After the court had imposed sentences of death on appellants, Brandt indicated that

he did not care to undertake an appeal. He met in Phoenix on September 11, 1963, with present counsel and an attorney from Chicago by the name of Lawrence, the purpose of which was to discuss possible grounds of appeal. The subject of a conflict of interest was considered. One of the counsel for Janovic testified that Brandt's

"statement at that point was that upon reflection after considering everything that he was of the opinion that there was a conflict of interest between the two defendants.

"At that point Mr. Lawrence asked him—sitting across the table—what do you mean by a conflict of interest. Mr. Brandt stated that in his opinion there was a greater degree of guilt in one of the defendants than in the other, and that was the conference at that time. There was no question asked as to who in his opinion had the greater degree of guilt, who the greater degree of guilt was upon."

Brandt's testimony on this point is that there was an area of possible weakness in the State's case in that appellants "may have agreed to accept equal blame." He testified:

"It's a problem that worried me. Should I have taken them apart? Is this an area where I had erred in the preparation of this case by not taking them apart separately and grilling them at length as to whether or not there was an agreed set of facts which they had disclosed to me. I hadn't done it. I wondered if I should have. I asked you and told you you should make this inquiry to determine if it's true."

The testimony of the two lawyers does not appear to be wholly reconcilable. But, assuming that a statement was made by Brandt which was understood by other counsel present to mean that there was possibly a greater degree of guilt on the part of one of the appellants than the other, it is clear from Brandt's testimony that he had in mind legal guilt in the sense that one may have committed the act of homicide and appellants may then have agreed to accept the blame equally. It may be noted that shortly thereafter, when Brandt was asked to sign an affidavit prepared by Kruchten's present counsel, he refused to do so. Further, neither appellant at the coram nobis hearing two years later testified that there was, in fact, any understanding to share the blame equally.

In conclusion it should be emphasized that the court at the time of sentencing had before it the original confessions, the statements made to the adult probation officer who investigated the offenses on behalf of the court after the pleas of guilty, the testimony of both appellants and of other witnesses. Kruchten's present argument is an attempt to shift the moral culpability for the offense to Janovic. We do not think the facts now pointed to establish a difference in culpability and, therefore, prejudice has not been shown within the meaning of Glasser. Morally, the minutiae now urged, if it establishes a difference, is not such as would justify a court in imposing the death penalty on one and a life sentence on the other.

Moreover, we think the record before the trial court at the time of sentencing adequately reflected the slight differences in background, personality and characteristics of these two appellants.

For all practical purposes, both legally and morally, these appellants occupied nearly identical positions. Accordingly, we conclude that appellant Kruchten was not deprived of the effective assistance of counsel under the Sixth Amendment to the Constitution of the United States.

Judgment is affirmed.

BERNSTEIN, V. C. J., and UDALL and McFARLAND, JJ., concurring.

NOTE: Justice LORNA E. LOCKWOOD did not participate in the determination of this decision.